Kim D. Cannon, Wyoming State Bar #5-1401
J. Mark Stewart, Wyoming State Bar #6-4121
Davis & Cannon, LLP
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Phone: 307/634-3210
Facsimile: 307/778-7118
cannon@davisandcannon.com
mark@davisandcannonchey.com

John A. Hutchings (*pro hac vice*)
Dill Dill Carr Stonbraker & Hutchings, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: 303/777-3737
Facsimile: 303/777-3823
jhutchings@dillanddill.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 05 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| THE MARTHA W. GIBBS REVOCABLE TRUST, SUSAN GIBBS, SCOTT M. GIBBS, AND JAMES W. GIBBS, TRUSTEES; and ALIDA D. TALMAGE TRUST FBO MARTHA GIBBS, SUSAN GIBBBS, SCOTT M. GIBBS, AND JAMES W. GIBBS, TRUSTEES. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) |
| DENNIS R. LAWRENCE; RANDALL POPE; CAPWEST SECURITIES, INC., a Colorado corporation; CAPSTONE FINANCIAL GROUP, INC., a Nevada corporation; COLORADO CAPITAL HOLDINGS, LLC, a Nevada limited liability company; DALE KEITH HALL, DIRECT CAPITAL SECURITIES, INC., a Delaware corporation; TIC CAPITAL MARKETS, INC., a Delaware corporation; CLAY HARRISS WOMACK; PACIFIC SECURITY INCOME PARTNERS LP, a Texas limited partnership; PACIFIC SECURITY GROUP, INC., a Texas corporation of forfeited existence; PERSONAL | )  Case No. 10CV0120D<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

MONEY MANAGEMENT, LLC, a Colorado          )
limited liability company; STEVE HOLMES;    )
RICHARD HANCOCK; and SECORE &             )
WALLER, LLP, a Texas limited liability         )
partnership; and DEBRA HARRAWOOD WHITE.  )
                                            )
            Defendants.                      )

## AMENDED COMPLAINT AND JURY DEMAND

COME NOW the Plaintiffs, the Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, and the Alida D. Talmage Trust FBO Martha Gibbs, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, by and through their attorneys, Davis & Cannon, LLP and Dill Dill Carr Stonbraker & Hutchings, P.C., and for their Amended Complaint against the Defendants state as follows:

### SUMMARY OF THE COMPLAINT

1.      Martha W. Gibbs is the beneficiary of both the Martha W. Gibbs Trust (the "Gibbs Trust") and the Alida D. Talmage Trust FBO Martha Gibbs (the "Talmage Trust") (the Gibbs Trust and The Talmage Trust are collectively referred to as the "Trusts" or the "Plaintiffs"). First Interstate Bank of Sheridan, Wyoming was the Trustee of the Talmage Trust from December 18, 1995 until November 3, 2006, when Dennis Lawrence ("Lawrence") was appointed Trustee of the Talmage Trust. During First Interstate Bank's tenure as Trustee of the Talmage Trust, the assets of the Talmage Trust were appropriately managed and invested by First Interstate Bank in conservative fixed income investments suitable and appropriate for the current beneficiary of the Talmage Trust, Martha W. Gibbs. After numerous requests for his

2

resignation and then negotiation of the terms of his resignation, Lawrence finally resigned as Trustee of the Talmage Trust on June 4, 2010.

2.      Until May 18, 2010, Martha W. Gibbs was the Trustee of the Gibbs Trust. On or about May 18, 2010, Martha W. Gibbs resigned as Trustee of the Gibbs Trust and Susan Gibbs, Scott M. Gibbs, and Jim W. Gibbs, three of her children, were appointed Trustees of the Gibbs Trust.

3.      As of 2006, Martha W. Gibbs was 75 years of age and a widow. She lacked any significant investment knowledge and experience and until late 2006, relied upon the Trust Department of First Interstate Bank to appropriately invest the assets of the Talmage Trust for her benefit and relied upon the knowledge and experience of Kevin Murphy, who conservatively and suitably invested the assets of the Gibbs Trust for the benefit of Martha W. Gibbs. In early 2006, Martha W. Gibbs was experiencing certain physical disabilities which contributed to a decrease in her mental capabilities. These facts were known both to the Trust Department at First Interstate Bank of Sheridan, Wyoming and by Lawrence who became the Trustee of the Talmage Trust on November 3, 2006.

4.      On the day of his appointment as Trustee, Lawrence caused the Talmage Trust to invest virtually one hundred percent of its assets in a direct participation program promoted by Striker Petroleum, LLC ("Striker") which, at that time, and for the next several years engaged in the operation of a fraudulent Ponzi scheme. Lawrence, together with Randall Pope ("Pope") caused the Talmage Trust to take $492,000 and invest it through an entity called Indian Plains, LLC, a Wyoming limited liability company ("Indian Plains"). Indian Plains, then, in turn, with the $492,000 from the Talmage Trust, purchased $492,000 of what is known

3

as Series B Striker Debentures. The Talmage Trust's purchase of the Striker Series B Debentures was structured as a purchase through Indian Plains because Lawrence and Pope knew that the Talmage Trust was not an "accredited investor" which was a requirement for a purchase of the Series B Debentures. Lawrence and Pope believed that as a result of the financial status of other members of Indian Plains, Indian Plains would qualify as an "accredited investor."

5.      On or about June 20 and 26, 2008, Lawrence and Pope caused the Gibbs Trust to purchase an additional $270,000 for securities in two direct participation programs. One of these direct participation programs was a continuation of the Striker fraudulent Ponzi scheme and consisted of $135,000 of what was known as Striker Series B-4 Debentures. The second of the direct participation program investment was in another fraudulent Ponzi scheme operated by Provident Royalties, LLC. Lawrence and Pope caused the Gibbs Trust to purchase $135,000 of preferred stock in what was known as Shale Royalties 12, Inc.

6.      Lawrence, together with Pope who is a registered representative employed by CapWest Securities, Inc. ("CapWest"), a registered broker-dealer, recommended, advised, induced, and sold to the Talmage Trust and the Gibbs Trust non-liquid, high risk, direct participation program investments ("PPM Investment") in a total of three offerings. These PPM Investments were unsuitable for both the Talmage Trust and the Gibbs Trust as they were non-liquid, high risk, at substantial risk of loss and represented virtually all of the assets of the Talmage Trust and a significant amount of the assets of the Gibbs Trust. The DPP Investments were further unsuitable for the Talmage Trust and the Gibbs Trust as the beneficiary of both the Talmage Trust and the Gibbs Trust, Martha W. Gibbs, was an elderly widow with physical

4

disabilities and diminishing mental capabilities and was thus in need of readily available liquid assets to provide for her needs and care and could not afford a loss of principal.

7.     The three DPP Investments sold to the Talmage Trust and the Gibbs Trust totaling \$762,000 were fraudulent Ponzi schemes.   The U.S. Securities and Exchange Commission ("SEC") has brought proceedings against the promoters of all of these DPP Investments which are the subject of this action, in each case alleging it to be a fraudulent Ponzi scheme. In each case, as more specifically described herein, the SEC obtained Orders freezing the assets of the promoters of the fraudulent Ponzi schemes and appointing Receivers in an effort to recoup what little assets or funds may be remaining for the benefit of investors. It appears that in each of the fraudulent Ponzi schemes sold to the Talmage Trust and the Gibbs Trust, there is little, if anything, to be collected and returned.

8.     In addition to Lawrence, Pope, and CapWest who were directly involved in the sale of the fraudulent and unsuitable DPP Investments to the Talmage Trust and the Gibbs Trust, Defendants in this action include others involved in the sale of the DPP Investments, those involved in the fraudulent Ponzi scheme, controlling persons and certain officers and directors of the promoters of the fraudulent Ponzi scheme. The Talmage Trust and the Gibbs Trust seek recovery of their investment losses together with interests, costs, and attorney's fees incurred in bringing this action.

## JURISDICTION AND VENUE

9.     The subject matter jurisdiction of this Court over this action is based upon 15 U.S.C. § 78aa, 15 U.S.C. § 77v, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over each of the Defendants pursuant to, *inter alia*, 15 U.S.C. § 78aa, 15 U.S.C. § 77v, and W.S. 1997 § 5-1-107.

11.     Venue in this action is proper in this District pursuant to, *inter alia*, 15 U.S.C. § 78aa, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).

## THE PARTIES

### The Plaintiffs:

12.     The Alida D. Talmage Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, is a Colorado trust situated in Sheridan, Wyoming and, under the Trust Agreement provisions, construction and administration of the Trust is to be determined under the laws of the State of Wyoming.    Martha W. Gibbs, during her lifetime, is the sole beneficiary of the Alida D. Talmage Trust.

13.     The Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, is a Wyoming trust situation in Sheridan, Wyoming. Martha W. Gibbs, during her lifetime, is the sole beneficiary of the Martha W. Gibbs Revocable Trust.

### The Defendants

14.     Dennis R. Lawrence is a certified public accountant residing in or around Buffalo, Wyoming, who maintains a principal business in Buffalo, Wyoming.    From approximately 1995 through April of 2010, Lawrence provided professional accounting services to the Trusts and their beneficiary Martha W. Gibbs, including providing investment advice, making investment recommendations, offering and selling securities to the Trusts, and making investment decisions as Trustee of the Talmage Trust as further described herein. Lawrence held himself out to be not only a professional accountant, but a professional

6

knowledgeable and sophisticated in financial and investment matters, qualified to give investment advice and make investment recommendations to the Trusts and others; and to serve as a Trustee of the Talmage Trust and make investment decisions for the Talmage Trust.

15.    Randall Pope is an individual residing in and maintaining a principal place of business in Fort Collins, Colorado. At all times material to the allegations of this Complaint, Pope was a registered representative employed by Defendant CapWest and licensed, pursuant to the Financial Industry Regulatory Authority ("FINRA"), federal law and Wyoming state law, to offer and sell securities in the State of Wyoming and other states. Pope, along with Lawrence and others, as set forth in this Complaint, offered and sold securities to the Trusts.

16.    CapWest Securities, Inc. is a Colorado corporation maintaining a principal place of business in Lakewood, Colorado. CapWest maintains other offices throughout the United States. CapWest is a broker-dealer licensed by FINRA and in various states, including the State of Wyoming, to offer and sell securities to the public. The securities sold to the Trusts were sold by and through CapWest.

17.    Capstone Financial Group, Inc. ("Capstone") is a Nevada corporation with its principal place of business, the same as CapWest, in Lakewood, Colorado. According to CapWest's report on file with FINRA, Capstone directly owns seventy-five percent or more of CapWest and directs the management and policies of CapWest.

18.    Colorado Capital Holdings, LLC ("Colorado Capital") is a Nevada limited liability company maintaining a principal place of business in Greeley, Colorado. According to the report of CapWest on file with FINRA, Colorado Capital indirectly, through Capstone,

7

owns seventy-five percent or more of CapWest and directs the management and policies of CapWest.

19.     Dale Keith Hall ("Hall") is an individual residing in the State of Colorado and maintaining principal places of business in Lakewood, Colorado and/or Greeley, Colorado. Hall is the CEO, President, Treasurer, CFO, and a director of CapWest and directly and/or indirectly individually and through Capstone and Colorado Holdings directs the management and policies of CapWest.  Hall is also a member of the Board of Directors of Capstone and a co-manager of Colorado Capital.

20.     Debra Harrawood White ("White") is an individual residing in the State of Colorado and maintaining a principal place of business in Greeley, Colorado. From on or about October 1993 to December 2007, White was the President and a director of CapWest and directly and/or indirectly individually and through Capstone directed the management and policies of CapWest during such period of time. From on or about January 1 through the present, White has served as a consultant to CapWest and maintains at least a sixteen percent ownership interest either directly and/or indirectly in CapWest.

21.     Direct Capital Securities, Inc. ("Direct Capital") is a Delaware corporation maintaining a principal place of business in Austin, Texas. Direct Capital is a broker-dealer licensed and registered, pursuant to FINRA, federal law, and Wyoming state law, as well as the laws of other states, to offer and sell securities to the public. Direct Capital served as the "managing broker-dealer" and/or a broker-dealer of the Striker Debenture Offerings, as further described in this Complaint.

22.     TIC Capital Markets, Inc. ("TIC Capital") is a Delaware corporation

8

maintaining a principal place of business in the State of Texas. According to the report of Direct Capital on file with FINRA, TIC Capital directly owns seventy-five percent or more of Direct Capital and directs the management and policies of Direct Capital.

23. Pacific Security Income Partners, LP ("Pacific Security Partners") is a Texas limited partnership maintaining a principal place of business in Austin, Texas. According to the report of Direct Capital on file with FINRA, Pacific Security Partners, through TIC Capital, is an owner of Direct Capital and directs the management and policies of Direct Capital.

24. Clay Harriss Womack ("Womack") is an individual who resides in, and maintains principal places of business in Austin, Texas. At all time relevant to the events alleged in this Complaint, Womack was an officer and director of Direct Capital. At all times relevant to the allegations of this Complaint, Womack was and/or currently is the Chairman and Chief Executive Officer of Direct Capital, TIC Capital, and Pacific Security Group, Inc., a forfeited Texas corporation, and individually and through TIC Capital and Pacific Security Group, Inc., directs the management and policies of Direct Capital. Further, at all times relevant to the allegations of this Complaint, Womack was a general securities principal with Direct Capital.

25. Pacific Security Group, Inc. ("Pacific Security") is a forfeited Texas corporation. According to the report of Direct Capital filed with FINRA, Pacific Security is an owner of Direct Capital and directs the management and policies of Direct Capital.

26. Personal Money Management, LLC ("Personal Money Management") is a Colorado limited liability company maintaining a principal place of business in Fort Collins, Colorado. Personal Money Management is the entity through which Pope conducts business

9

and transactions, including sales of the DPP Investments to the Trusts which are the subject matter of this Complaint.

27.     Steve Holmes ("Holmes") is an individual residing in and maintaining a principal place of business in the Dallas, Texas metropolitan area.  At certain times relevant to the allegations contained in this Complaint, Holmes was the Vice President, general counsel, Chief Operating Officer and/or outside legal counsel of Striker Petroleum, LLC, the promoter of the Striker Debentures sold to the Trusts and purportedly the "independent third party trustee" for the Debenture holders of the Striker Debentures sold to the Trusts.

28.     Richard Hancock ("Hancock") is an individual who at all times relevant to the allegations of this Complaint resided in the Tulsa, Oklahoma area.  At all times relevant to the allegations contained in this Complaint, Hancock served as the Chief Financial Officer of Striker, the promoter of the Striker Debentures sold to the Trusts and, thus, was intimately familiar with the financial affairs of Striker, and other affiliated and related entities of Striker, in which securities consisting of the Striker Debentures were sold to the Trusts.

29.     Secore & Waller, LLP ("Secore & Waller") is a Texas limited liability partnership and law firm maintaining a principal place of business in Dallas, Texas.  Secore & Waller prepared the Private Placement Memorandum and related documents of Shale Royalties 12, Inc., a Delaware corporation, the securities of which were offered and sold to the Trusts.  Shale Royalties 12, Inc. is one of approximately 21 separate entities and offerings promoted by Provident Royalties, LLC.  The offerings of Provident Royalties, LLC were a fraudulent Ponzi scheme.   Secore & Waller prepared the Offering Memorandum for all of the offerings conducted by Provident Royalties, LLC.   Joan Conway Waller of Secore & Waller is the

incorporator of Shale Royalties 12, Inc. Between approximately September of 2006 and January of 2009, Provident Royalties, LLC conducted an on-going series of 21 offerings using 21 separate entities, including Shale Royalties 12, Inc., all of which were nearly identical in form and substance according to allegations of the U.S. Securities and Exchange Commission in *Securities and Exchange Commission v. Provident Royalties, LLC*, Case No. 3-09 CV 1238-L, United States District Court for the Northern District of Texas (the "Shale Royalties Litigation").

## THE FRAUDULENT SCHEMES

30. The Talmage Trust and the Gibbs Trust, along with numerous other investors throughout the country, were the victims of two separate fraudulent Ponzi schemes described in further detail in the paragraphs below. Certain of the Defendants in this case, as described in this Complaint, offered and sold the fraudulent Ponzi scheme investments to the Talmage Trust and the Gibbs Trust, while other of the Defendants were either additional direct or indirect perpetrators of the fraud or aided and abetted the perpetrators of the fraudulent Ponzi schemes. The Talmage Trust was induced to invest $492,000 into one of the fraudulent Ponzi schemes and the Gibbs Trust was induced to invest $270,000 into two of the fraudulent Ponzi schemes. Both the Talmage Trust and the Gibbs Trust have suffered a total loss of such amounts.

## Striker Petroleum, LLC

31. Striker Petroleum, LLC ("Striker") is a Texas limited liability company with its principal place of business in Dallas, Texas. From July, 2005 to September, 2006, Striker conducted three tax advantaged oil and gas offerings (the "Legacy Offerings") selling over $60,000,000.00 of undivided working interests in purported producing oil and gas properties.

11

These Legacy Offering investments were sold through a nationwide network of broker-dealers including Direct Capital utilizing private placement memoranda and brochures. Although the Legacy Offerings initially achieved the projected returns and Striker was able to pay to investors the projected returns, production soon fell off and Striker was unable to make the promised returns to investors in the Legacy Offerings.

32.     In mid-2006, at the suggestion of Pope, who had been involved in the Legacy Offerings, Striker decided to raise capital by offering Debentures. Commencing on September 18, 2006, and continuing through September of 2008, through a series of five Debenture Offerings entitled "Series A," "Series B," "Series B-2," "Series B-3," and "Series B-4" (the "Debenture Offerings") Striker raised an aggregate of approximately $57,000,000.00 from approximately 540 investors nationwide. Striker offered its Debentures through many of the same broker-dealers including Direct Capital and CapWest that sold the Legacy Offerings, again using private placement memoranda and brochures (the "Striker Offering Documents"). The Striker Offering Documents of the Debenture Offerings falsely represented:

a.   The proceeds from each Debenture Offering would be used primarily to acquire, develop, and operate oil and gas properties and for working capital;

b.   The Debentures would be collateralized by the oil and gas properties acquired in an amount twice that of the purchase price of the Striker Debentures;

c.   The Debenture holders would receive a stated return from such activities;

d.   An independent third party trustee would be appointed for the benefit of the Debenture holders; and

12

e.  The financial condition and performance of Striker by significantly overstating Striker assets and actual revenue from operations.

33.     Rather than using the proceeds from the sale of the Striker Debentures as stated in the private placement memoranda, Striker used substantial amounts of the proceeds to pay promised returns to investors in prior offerings, including the Legacy Offerings, and in prior Debenture Offerings, thus creating a fraudulent Ponzi scheme in which new investor money was used to pay promised returns to older investors.  As the result of proceeds being used for purposes other than acquiring oil and gas properties, the debentures were not collateralized by acquired properties in an amount twice that of the purchase price of the Striker Debentures. Further, any return which Debenture holders received was at least in part from the proceeds of subsequent Debenture sales rather than from the purposes stated in the private placement memoranda.

34.     The Talmage Trust purchased $492,000.00 of Striker Debentures in the Series B Debenture Offering on or about December 5, 2006.  On or about June 20, 2008, the Gibbs Trust purchased $135,000.00 of Striker Debentures in the Series B-4 Debenture Offering.  Private Placement Memoranda for the Series B and B-4 Debenture Offerings, as well as all other Striker Debenture Offerings, were false and misleading in numerous respects as alleged above and as alleged in greater detail below.

35.     An aggregate of $11,500,000.00 was raised in the Series B Debenture Offering and an aggregate of $12,500,000.00 was raised in the Series B-4 Debenture Offering.  The private placement memorandum told purchasers of the Series B and B-4 Debentures that approximately ninety percent of the money raised would be used for the acquisition of

13

properties, drilling oil and gas wells, completing oil and gas wells, and working capital when, in fact, substantial proceeds were used to pay returns to prior investors. Further, the private placement memorandum told purchasers of Series B and Series B-4 Debentures that the Debentures purchased would be collateralized with oil and gas properties when, in fact, the Debentures were not collateralized to the extent represented. The purchasers of Debentures in the Series B and Series B-4 Offerings were not told that significant portions of the proceeds would be used to pay fixed return payments to investors in the Legacy Offerings and interest payments to prior Debenture holders. The exact amount of payments from the purchasers of Series B and Series B-4 Debentures used to make payments to Legacy Offerings investors and prior Debenture holders is unknown, but it is believed to be millions of dollars.

36.    The Offering Documents for the Series B and Series B-4 Debentures, as well as the other series of Debentures, contained unaudited financial statements. These unaudited financial statements, and in particular the unaudited financial statements for the Series B and Series B-4 Debentures, significantly overstated the assets and earnings of the promoter, Striker. In the Series B Debenture Offering, the assets of Striker were inflated by approximately 47.6 million dollars. In the Series B-4 Debenture Offering, the assets of Striker were inflated by approximately 95.8 million dollars. The revenues of Striker were also inflated by including as revenue the amounts raised from the Legacy Offerings thereby obscuring the fact that Striker was losing money on an operating basis.

37.    The private placement memorandum for the Series B and Series B-4 Offerings, as well as the other Debenture Offerings, falsely represented that the Debentures would be collateralized by oil and gas properties and that Striker would appoint an "independent third

party trustee" to hold legal title to the collateral for the benefit of the Debenture holders. The trustee would have various powers, the most important of which was the right to engage in a non-judicial foreclosure of collateral in case of default by Striker. Contrary to the representations in the private placement memorandum for the Series B and Series B-4 Debenture Offerings, the trustee for the Debenture collateral was not an independent third party, but instead was Holmes, who at various times relevant to the allegations of this Complaint was the Vice President, general counsel, Chief Operating Officer, and/or outside legal counsel, and was neither independent nor a third party. Soon after Striker failed to make the Debenture payments in December of 2008, Holmes resigned as trustee, claiming he never considered himself a true "trustee" for the Debenture holders claiming no fiduciary duty nor actual control and possession of the collateral.

38.     As a result of the foregoing, and other fraudulent activities, on or about December 3, 2009, the SEC filed a Complaint in the case known as *Securities and Exchange Commission v. Striker Petroleum, LLC*, Case No. 3:09-cv-02304-D, United States District Court for the Northern District of Texas (the "Striker Litigation"). On December 3, 2009, the United States District Court for the Northern District of Texas in the Striker Litigation entered an Agreed Order Appointing Receiver in which the Court appointed a Receiver for Striker. The Agreed Order Appointing Receiver enjoins litigation or other proceedings against the Receiver, the Defendants in the Striker Litigation, the Receivership Estate, and any agent, officer or employee related to the Receivership Estate. After writing to and speaking with the Receiver in the Striker Litigation, it is believed that the claims brought against the Defendants in this case do not violate such injunction.

15

**Provident Royalties, LLC Offerings**

39.     Provident Royalties, LLC ("Provident"), is a Delaware limited liability company

with its principal place of business in Dallas, Texas. Between approximately September of

2006 and January of 2009, Provident, through 21 separate entities it created, solicited

investments and sold preferred stock in fraudulent private placements, raising approximately

$485,000,000.00 from approximately 7,700 investors nationwide. According to the private

placement memoranda of the 21 offerings, funds raised were to be used for the acquisition and

development of specific oil and gas properties and investors in each of the various offerings

were to receive a return from the assets acquired for that offering. Instead, Provident operated

a fraudulent Ponzi scheme. Revenues from oil and gas exploration and development activities

of the initial entities were insufficient to pay promised returns. When this occurred, Provident

used substantial amounts of money from each of the subsequent offerings to pay promised

returns to investors in prior offerings rather than for the acquisition and development of oil and

gas properties and exploration and development activities as represented in the private

placement memoranda.

40.     Investors, including the Trusts, that purchased preferred stock in the various

offerings were told that eighty-six percent of the funds would be placed in oil and gas

investments. This representation was false in that significant amounts of investors' funds,

including those of the Trusts, were used to pay returns to investors in prior offerings.

41.     Investors, including the Trusts, were not told that their funds would be

comingled with funds derived from other private placement offerings of Provident when, in

fact, funds were comingled among the numerous offerings conducted by Provident.

16

42.      On or about June 26, 2008, the Gibbs Trust purchased $135,000.00 of preferred

stock in Shale Royalties 12, Inc. ("SR 12"), one of the fraudulent Ponzi offerings. The details

of this purchase are set forth below in the Complaint.

43.      On or about July 1, 2009, the SEC brought the Shale Royalties Litigation. On

July 2, 2009, the United States District Court for the Northern District of Texas entered an

Order granting a Temporary Restraining Order, Appointing Receiver, Freezing Assets, Staying

Litigation, Prohibiting the Destruction of Documents, and Accelerating Discovery (the "Order

Appointing Receiver"). The Receiver appointed in the Shale Royalties Litigation is the same

Receiver appointed in the Striker Petroleum Litigation. The Stay of Litigation Order contained

in the Order Appointing Receiver is identical to the Stay of Litigation Order contained in the

Agreed Order Appointing Receiver in the Striker Petroleum Litigation. After writing and

speaking with the Receiver in the Shale Royalties Litigation, and counsel for the SEC, it is

believed that the bringing of this action against the Defendants named herein does not violate

the Injunction and/or Stay of the United States District Court for the Northern District of Texas

in the Shale Royalties Litigation.

**The Trusts' Purchases**

44.      In each of the offerings described above, in order to purchase the offered

investment, the purchaser must be what is referred to as an "accredited investor." Pursuant to

17 C.F.R. § 230.501(b) an "accredited investor" is an individual or entity who meets certain

minimum financial criteria. The Talmage Trust was not an accredited investor. Defendants

Lawrence and Pope knew the Talmage Trust was not an accredited investor. However, in

recommending, advising, inducing and selling the Striker Series B Debenture to the Talmage

17

Trust, Lawrence, as Trustee of the Talmage Trust, and Pope, as a registered representative of CapWest, caused the Talmage Trust to place $492,000 into an entity known as Indian Plains, upon their belief that based upon the financial condition of one or more other members of Indian Plains, Indian Plains would qualify as an "accredited investor." The two other members of Indian Plains each purchased a much smaller amount of Striker Series B Debentures, each such other member purchasing approximately $62,000 of Striker Series B Debentures. Lawrence, as the Trustee of the Talmage Trust, and the accountant for Indian Plains, agreed to document the return of money upon the Striker Series B Debentures to Indian Plains, to see that it was properly allocated to the Talmage Trust and the other members of Indian Plains. Lawrence and Pope structured the Talmage Trust's purchase of the Striker Series B Debentures through Indian Plains for the express purpose of having the Talmage Trust make the investment which, by the very terms of the offering, was not suitable for the Talmage Trust. In furtherance of this fraud and deceit, Lawrence and Pope caused a Subscription Agreement of Indian Plains in the amount of $492,000 to be completed in a false and misleading manner, falsely portraying the actual purchaser as Indian Plains while, in fact, the actual purchaser was the Talmage Trust.

45.     On or about December 5, 2006, the Talmage Trust purchased $492,000 of Striker's Series B Debentures.

46.     The Gibbs Trust purchased the following investments on or about the following dates and in the following amounts:

| Date | Investment | Amount of Investment |
|------|------------|----------------------|
| June 20, 2008 | Striker Petroleum, LLC Series B-4 Debentures | $135,000.00 |
| June 26, 2008 | Shale Royalties 12, Inc. Preferred Stock | 135,000.00 |
| | TOTAL | $270,000.00 |

18

47.     Commencing at least as early as 1995, Lawrence was the accountant for the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs individually. Over the period of time between 1995 and November of 2006, Lawrence gained the trust and confidence of Martha W. Gibbs based upon the accountant/client relationship which existed between Lawrence and each of the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs individually. In addition, at various times between 1995 and November of 2006, Lawrence served as the accountant for John Gibbs, a son of Martha W. Gibbs, and one or more businesses in which James W. Gibbs, another son of Martha W. Gibbs, was involved. Further, Lawrence and John Gibbs engaged in various investments together. Thus, by November of 2006 not only had Lawrence gained the trust and confidence of Martha W. Gibbs, but that of John Gibbs and James W. Gibbs.

48.     The contingent beneficiaries to the Talmage Trust and the Gibbs Trust are Susan Gibbs, a daughter of Martha W. Gibbs, Scott M. Gibbs, a son of Martha W. Gibbs, James W. Gibbs, and John Gibbs (collectively the foregoing are referred to as the "Gibbs children").

49.     In mid-February of 2006, Martha W. Gibbs underwent extensive back surgery and as a result was in a rehabilitation facility from approximately mid-February of 2006 through approximately October 30, 2006. She was, during such time, physically disabled and mentally unable to make any significant investment or business decisions including, but not limited to, decisions regarding replacement of the Trustee for the Talmage Trust and any significant investment decisions, such as a decision to invest $492,000 in Striker Series B Debentures. In the fall of 2006, Lawrence was aware of both the disabling physical and mental condition of Martha W. Gibbs.

19

50.     In the fall of 2006, Lawrence recommended to the Gibbs children a purchase by the Talmage Trust and/or the Gibbs Trust of Striker Debentures.   In recommending the purchase of the Striker Debentures to the Gibbs children, Lawrence made the following representations and engaged in the following described acts and conduct:

a.   Lawrence advised the Gibbs children that an investment in Striker Debentures was a safe and secure investment and suitable for either or both of the Trusts, in part, for reason that the Debentures would be collateralized by oil and gas interests purchased with the proceeds from the sale of the debentures in an amount equal to twice that of the purchase price of the Debentures.

b.   Lawrence sent, or caused to be sent, to Susan Gibbs, a Confidential Private Placement Memorandum of the 13% Series A Senior Secured Convertible Debentures.   This Confidential Private Placement Memorandum was substantially similar to, if not identical to, the Confidential Private Placement Memorandum for the Series B Debentures ultimately purchased by Lawrence as Trustee of the Talmage Trust.

c.   Lawrence arranged for the participation by Susan Gibbs in a conference call, the participants of which included Randy Pope, and Steve Holmes, then an executive officer and general counsel of Striker.

51.     During this conference call which involved Pope, Holmes, and Susan Gibbs, Pope and/or Holmes made untrue statements of material fact to Susan Gibbs, and all other participants of such call, including but not limited to the following:

a.   That the Striker Debentures were a conservative, high yielding, investment. This statement was false because Striker Debentures were neither safe nor secure and although

"high yielding" for a short period of time, ultimately resulted in a total loss for the Talmage Trust.

b. That the Debentures were safe and secure because they would be collateralized with oil and gas properties purchased from the proceeds of the sale of the Debentures in an amount equal to twice that of the purchase price of the Debentures. This statement was untrue because at the time, significant portions of the proceeds of the Striker Debenture Offerings were used to pay promised returns to investors in the prior Legacy Offerings and prior purchasers of Striker Debentures. Thus, oil and gas properties were not being purchased as represented with the use of proceeds and the Debentures were not being collateralized as represented.

c. That Striker would "go public" and that in such event the Debenture holders would have the opportunity to convert their Debentures to stock at a premium thus receiving a return greater than the promised thirteen percent return or, could continue receiving the thirteen percent return; however, the Debentures would ultimately have liquidity. This statement was false because Striker had no reasonable prospect of going public, in part, because going public would have required audited financial statements which would have revealed Striker's fraudulent Ponzi scheme.

52.    During this conference call which involved Pope, Holmes, and Susan Gibbs, among others, Pope and Holmes omitted to disclose material facts which, in light of the circumstances under which statements were made, rendered such statements made misleading including, but not limited to:

a. The Private Placement Memorandum for the Series A Debenture which had

21

been provided to Susan Gibbs represented that an independent third party trustee would be appointed for the benefit of Debenture holders additionally securing the Debentures. Pope and Holmes failed to disclose that Holmes was the purported "independent third party trustee" and that he was neither independent nor a third party as he was, at the time of the conference call, an executive officer, general counsel and/or outside legal counsel of Striker, and thus neither independent nor a third party.

b.   That contrary to the unaudited financial statements contained in the Confidential Private Placement Memorandum of the Series A Debentures, which represented that Striker had significant assets and was operating at a profit, that the assets had been inflated by improperly over valuing what oil and gas properties Striker did own, and by including as operating revenues the proceeds from Debenture Offerings, thus concealing the fact that Striker Petroleum was actually operating at a loss.

c.   That contrary to the representations in the Private Placement Memorandum, that offering proceeds were being used to purchase oil and gas properties as represented, in fact, significant amounts of offering proceeds were being used to pay promised returns to investors in the Legacy Offerings and prior purchasers of Debentures rather than the purchase of oil and gas properties.

53.   The representations of Pope and Holmes in the conference call with Susan Gibbs and others, in the fall of 2006, falsely portrayed that Striker was a legitimate and financially stable oil and gas company engaged in the business as described in the Confidential Private Placement Memorandum and returning the financial results set forth in the Confidential Private Placement Memorandum when, in fact, it was nothing more than a fraudulent Ponzi scheme in

which proceeds from the sale of later Debentures were used to pay promised returns to purchasers of earlier debentures and securities offerings of Striker.

54.     Lawrence knew that the then current Trustee of the Talmage Trust, First Interstate Bank of Sheridan, Wyoming, would never permit the Talmage Trust to make an investment in Striker Debentures because First Interstate Bank would determine that such an investment by the Talmage Trust was unsuitable for the Talmage Trust given the condition of its beneficiary, Martha W. Gibbs, and the fact that the Striker Debentures were an illiquid, high risk, speculative investment unsuitable for the Talmage Trust. Therefore, in order to allow and cause the Talmage Trust to purchase Striker Debentures, Lawrence, who had obtained the trust and confidence of Martha W. Gibbs, John Gibbs, and James Gibbs, proposed that he be appointed Trustee of the Talmage Trust, replacing First Interstate Bank. In recommending to Martha W. Gibbs and the Gibbs children that he replace First Interstate Bank as Trustee of the Talmage Trust, Lawrence represented to Martha W. Gibbs and the Gibbs children that he could obtain higher returns on the Trust's investments than First Interstate Bank through the making of investments by the Talmage Trust in investments that were as safe and as secure as those made by First Interstate Bank. This representation was false and misleading because it is a basic premise of investments that higher returns equate to greater risk.     Thus, any representation of increased returns, such as a purported guaranteed thirteen percent return with the safety and security of low risk investments such as AAA rated bonds, is an inherently false statement. As an accountant, and as a person who served as Trustee of the Talmage Trust, gave investment advice and made investment recommendations, Lawrence knew or should have known that such statement was false.

23

55.     Based upon the representations of Lawrence, Martha W. Gibbs and the Gibbs children consented to the replacement of First Interstate Bank as Trustee of the Talmage Trust and the appointment of Lawrence as Trustee of the Talmage Trust, thus permitting Lawrence to cause the Talmage Trust to purchase $492,000, representing virtually all of the assets of the Talmage Trust, of Striker Series B Debentures.  Lawrence was appointed Trustee of the Talmage Trust on November 3, 2006, and on November 3, 2006 Subscription documents were executed for the Talmage Trust's purchase of $492,000 of Striker Series B Debentures.  On November 7, 2006, Lawrence, as Trustee of the Talmage Trust, instructed First Interstate Bank to liquidate all of the Talmage Trust's investments and send all the proceeds to an account Lawrence controlled as Trustee of the Talmage Trust.  By December 4, 2006, First Interstate Bank transferred all of the Talmage Trust's assets to Lawrence as instructed.  Lawrence, as Trustee of the Talmage Trust, then transferred all of the Talmage Trust's assets to Indian Plains, which then transferred the funds to Striker on or about December 5, 2006 to complete the Talmage Trust's purchase of the Series B. Debentures.

56.     On information and belief, the Plaintiffs allege that the Talmage Trust's purchase of $492,000 of Striker Series B Debentures was based not only upon the false representations and omissions of Lawrence, Pope, and Holmes, but upon the material false statements and omissions of material fact contained in the Confidential Private Placement Memorandum of the Striker Series B Debentures.  The facts and information upon which Plaintiffs base this allegation are:

a.   Lawrence was a purchaser of Series B Debentures of Striker.

b.  In the fall of 2006 Lawrence gave to other persons the Confidential Private Placement Memorandum for the Striker Series B Debentures and thus had in his possession such Confidential Private Placement Memorandum.

57.  The Talmage Trust, through Lawrence as its Trustee, was aware of the information contained in the Confidential Private Placement Memorandum for the Striker Series B Debentures.  The Confidential Private Placement Memorandum of the Striker Series B Debentures contained material untrue statements of material fact including, but not limited to:

a.  The amount of the proceeds which would be used to purchase oil and gas properties.  In fact, far less than the represented amount was to be used to purchase oil and gas properties.  Instead, substantial amounts of the offering proceeds were utilized to pay promised returns to purchasers in the Legacy Offerings and prior Debenture Offerings.

b.  That the proceeds from the purchase of Striker B Series Debentures would be used primarily for the purchase of oil and gas properties which would then generate the promised returns of such Debenture purchases.  This statement was false for reason that proceeds from the Series B Debenture Offerings were to be used to pay investors in the Legacy Offerings and prior Debenture Offerings and returns to purchasers of Series B Debentures would not and did not derive from returns upon oil and gas properties purchased.

c.  That the Series B Debentures would be collateralized by oil and gas properties purchased with the proceeds from the purchase of the Series B Debentures in an amount equal to twice the purchase price of such Debentures.  This statement was false for reason that the Debentures were not collateralized in an amount of twice their purchase price, or any other significant amount, for reason that oil and gas properties were not purchased as represented,

25

instead, the proceeds from the Debenture Offerings were used in substantial part to pay returns to investors in the Legacy Offerings and prior Debenture Offerings.

        d. That there would be appointed an independent third party trustee for the Series B Debentures. This statement was false for reason that in the prior Debenture Offering, which contained the same representation, an independent third party trustee had not been appointed, instead, Holmes, an executive officer, the general counsel and/or outside legal counsel of Striker, was appointed the independent third party trustee. Holmes was neither independent nor a third party. Holmes was to be the independent third party trustee for the Series B Debentures and would be neither independent nor a third party.

        e. That the assets of Striker were as represented in the unaudited financial statements accompanying the Memorandum when, in fact, the assets were inflated by at least $47.6 million or, 413%.

        f. That the revenue represented in the unaudited financial statements was significantly overstated by including as "investment income" funds Striker had raised through the Legacy Offerings, falsely identifying $39,000,000 of the $40,000,000 of "total income" as "investment income."

    58. The Private Placement Memorandum for the Striker Series B Debentures omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to:

        a. The risks of a lack of audited financial statements of Striker and of Striker's prior offerings, including the Legacy Offerings and the prior Debenture Offerings, such risks including:

i.   That offering proceeds from prior offerings had been used for purposes other than as stated in the Private Placement Memorandum;

ii.   That the assets of Striker may be overstated;

iii.   That the revenues of Striker may be overstated; and

iv.   That offering proceeds may be used to pay promised returns to investors in prior offerings, including some Legacy Offerings and the prior Debenture Offerings, thus permitting the operation of a fraudulent Ponzi scheme.

b.   That the purported Trustee for the Debentures purchased by the Talmage Trust was Holmes, who was at the time, either an executive officer, general counsel, or outside legal counsel to Striker and thus, in fact, was not an "independent third party trustee" as represented.

c.   That although Striker purported to have positive operating revenues, it was, in fact, operating at a loss.

59.   Lawrence and Pope structured the Talmage Trust's purchase of the Striker Series B Debentures through Indian Plains. In November of 2006, Indian Plains had two equal members, John Gibbs and Tony Schiffer. Indian Plains was essentially an inactive Wyoming limited liability company in November of 2006 whose only asset consisted of approximately $124,000 which resulted from prior profitable business activities of Indian Plains. As the accountant and Trustee of the Talmage Trust, Lawrence transferred into Indian Plains $492,000 of the Talmage Trust, which represented substantially all of the Talmage Trust's assets as of November 3, 2006 for the sole purpose of effecting the Striker investment. On November 3, 2006, Lawrence and Pope knew that the Talmage Trust was not an "accredited investor" and Lawrence and Pope further knew that pursuant to the terms of the Confidential Private

27

Placement Memorandum for the Series B Debentures, a purchaser must be an "accredited investor." Lawrence and Pope caused the Talmage Trust's purchase of $492,000 of Series B Debentures to occur through Indian Plains because they believed that by aggregating the net worth of the Talmage Trust, John Gibbs, and Tony Schiffer, Indian Plains would qualify as an "accredited investor." Lawrence represented to the Gibbs children that as the accountant for Indian Plains, the Talmage Trust, and Martha W. Gibbs, that he would account for returns from Striker which would be paid to Indian Plains from the Talmage Trust's purchase of the Series B Debentures, and assure that the Talmage Trust and its beneficiary, Martha W. Gibbs, received its correct proportionate share of all such returns.

60.    Structuring the Talmage Trust's purchase of the Series B Debentures through Indian Plains was a deceptive act and practice of Lawrence and Pope. Lawrence and Pope knew, by the very terms of the Confidential Private Placement Memorandum, as well as the facts and circumstances of the Talmage Trust's beneficiary, Martha W. Gibbs, that investing virtually one hundred percent of the Talmage Trust's assets in and illiquid, high risk, speculative investment by means of a deceptive act and practice was unsuitable. Lawrence and Pope knew that structuring the Talmage Trust's purchase of $492,000 of Series B Debentures through Indian Plains was a deceptive act and practice.

61.    On November 3, 2006, as a result of the representations of Lawrence, Pope, as well as the Confidential Private Placement Memorandum of the Series B Debentures, John S. Gibbs, as managing member of Indian Plains, executed a Subscription Agreement in the amount of $492,000 for the Series B Debentures, said subscription being on behalf of and for the benefit of the Talmage Trust. With respect to the Talmage Trust's purchase of Striker

Series B Debentures, Pope acted as the registered representative and CapWest was the selling broker-dealer.

62.     Between approximately September, 2007 and April of 2008, Martha W. Gibbs underwent further surgery and underwent extended rehabilitation as a result of such surgery. By May of 2008, Martha W. Gibbs' physical condition had become further debilitating and her mental capacity had continued to diminish. By May of 2008, Martha W. Gibbs lacked the mental capacity to make informed investment decisions. Lawrence was aware of Martha W. Gibbs' diminished mental capacity at least by virtue of his relationship with her son, John S. Gibbs, as well as by virtue of his position as her accountant and Trustee of the Talmage Trust. Pope was also aware of Martha W. Gibbs' diminished mental capacity based on his relationship with Lawrence pursuant to which Lawrence and Pope jointly sold numerous investments, including investments in Striker, to many individuals in the Sheridan and Buffalo, Wyoming area.

63.     On information and belief, on or about May of 2008, Lawrence and Pope offered and sold to the Gibbs Trust $135,000 of Series B-4 Striker Debentures and $135,000 of preferred stock in SR-12. This allegation is made on information and belief for reason that none of Susan Gibbs, Scott Gibbs, and James Gibbs were aware of the transactions until at least one year after their occurrence and presently, Martha W. Gibbs is unable to recall any specific facts regarding the transactions. The facts and information upon which Plaintiffs base this allegation are:

a.  Lawrence and Pope jointly engaged in sales of preferred stock in SR-12 to other purchasers in the Sheridan-Buffalo, Wyoming area including, but not limited to the Naomi L. Miles Revocable Trust.

b.  On June 5, 2008, Pope, though Personal Money Management, wrote to Martha W. Gibbs sending to her copies of her "CapWest, Striker, and Share Royalties 12 documents." In this June 5, 2008 letter, Pope thanked Martha W. Gibbs for her business.

c.  On June 10, 2008, Lawrence sent to Nathaniel Glossi, an assistant to Pope, a voided check of the Martha W. Gibbs Revocable Trust with the following note:

> Attached is a voided [check] on the account in which Martha Gibbs, Striker and Provident payments will be made. I have Provident wire instructions, please send Strikers. Dennis. (brackets added)

d.  The Subscription Agreement for the SR-12 preferred stock expressly states that Lawrence reviewed the investment on behalf of the Gibbs Trust.

64.  In recommending and selling to the Gibbs Trust the Striker Series B-4 Debentures and the preferred stock of SR-12, Lawrence and Pope owed a duty to the Gibbs Trust to conduct a reasonable and prudent due diligence investigation of Striker and each of its prior offerings and of SR-12, and each of the prior offerings of Provident Royalties, the promoter of SR-12. Lawrence's duty derives from a fiduciary duty which he owed to Martha W. Gibbs and the Gibbs Trust based upon his accountant-client relationship with the Gibbs Trust, Martha W. Gibbs, individually, and the Talmage Trust, his investment advisor-client relationship with the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs individually, and as Trustee of the Talmage Trust which placed him in a position of trust and confidence as to Martha W. Gibbs, the Trustee and beneficiary of the Gibbs Trust. Pope's duty of due diligence, which includes a duty of due

diligence of CapWest, derives from their obligations under FINRA which requires its members in the offer and sale of any security, to have a suitable basis for recommending the investment which includes within it the duty and obligation to conduct a reasonable due diligence investigation of the security and its offering.

65.     Lawrence, Pope, and CapWest breached this duty to conduct a reasonable due diligence investigation by failing to conduct even a cursory due diligence investigation. A cursory or reasonable due diligence of investigation would have included but not be limited to the following:

      a.  Obtaining reliable financial information on the offeror and all prior offerings of the offeror and its affiliates;

      b.  Investigating the actual use of proceeds on prior offerings to determine whether they complied with the representations contained in such Confidential Private Placement Memoranda of prior offerings;

      c.  In the case of prior Striker Debenture offerings, determining whether an independent third party trustee had been appointed for the benefit of Debenture holders as represented in Confidential Private Placement Memoranda;

      d.  In the case of Striker's prior offerings, determining whether the Debentures had been collateralized to twice the amount of their purchase price as represented in the Confidential Private Placement Memoranda of prior offerings.;

      e.  Examining historical financial statements of the promoter and its affiliates;

      f.  Investigating the performance and operation of prior offerings; and

g. Carefully examining third party reports which may raise red flags, such as independent due diligence reports in the case of SR-12 prepared by Mick & Associates which highlighted numerous red flags regarding the SR-12 Offering.

66. Lawrence, Pope, and CapWest had a lengthy history of participating in offerings of both Striker and Provident Royalties entities of at least one and one-half years preceding the offer and sale to the Gibbs Trust of the Striker Series B-4 Debentures and preferred stock of SR-12. Lawrence, Pope, and CapWest thus had ample time and opportunity within which to have conducted a reasonable due diligence investigation.

67. Pope and CapWest participated in the offer and sale of Series A, Series B, Series B-2, and Series B-3 Striker Debentures prior to their participation in the offer and sale of Series B-4 Striker Debentures. The Series A, Series B, Series B-2, and Series B-3 Striker Debenture Offerings, in which Pope and CapWest directly participated, raised from the public an aggregate of $44,600,000. The Striker Series A Offering commenced as early as October 23, 2006, over one and one-half years prior to the Gibbs Trust's purchase of the Series B-4 Debentures.

68. As a broker-dealer participating in the offering of securities of Striker, pursuant to FINRA rules, and rules of FINRA's predecessor, the National Association of Securities Dealers ("NASD"), CapWest had an obligation and a duty to conduct a reasonable due diligence investigation of Striker, their officers, directors, and control persons and prior offerings.

32

69.     Had Lawrence, Pope, and CapWest performed a reasonable due diligence investigation of Striker in its prior offerings as required pursuant to the duties they owed to the Gibbs Trust, they would have discovered:

a.   That money used in prior offerings was not being utilized as represented but instead, was being used to pay promised returns to investors in earlier offerings;

b.   That the financial information and financial statements contained in the Striker prior offerings was false and inaccurate;

c.   That Striker had not appointed an independent third party trustee for the benefit of Debenture holders as represented in the Confidential Private Placement Memoranda of prior Striker offerings but, instead, had appointed Steve Holmes, an executive officer, general counsel, and/or outside legal counsel of Striker; and

d.   That the Debentures in prior Striker Offerings were not collateralized as was represented in the Confidential Private Placement Memoranda of the prior Striker Offerings.

70.     Had Lawrence, CapWest, and Pope conducted a reasonable due diligence investigation of prior Provident Offerings as required pursuant to the duties which they owed to the Gibbs Trust, they would have discovered:

a.   That money used in prior Provident offerings was not being utilized as represented but, instead, was being used to pay promised returns to investors in earlier offerings;

b.   That oil and gas assets were not purchased as represented in prior Provident Royalties offerings;

c.   That offering proceeds from prior offerings were comingled;

33

d.  That eighty-six percent of the subscription proceeds from prior offerings were, in fact, not used to purchase oil and gas investments as had been represented; and

e.  That dividends were not paid from revenues but from the sale of preferred stock in subsequent Provident offerings.

71.  Lawrence and Pope were aware that none of the offering material for the Series B-4 Debentures and the SR-12 preferred stock contained audited financial statements of the issuer, the promoter, any prior offerings, or any affiliates. Lawrence, as an accountant, Pope, as a FINRA registered representative, and CapWest, as a FINRA registered broker-dealer, all knew or should have known of the significance of the lack of any audited or otherwise reliable financial information concerning the offerer, the issuer, its affiliates, and any prior offerings. Lawrence, Pope, and CapWest all knew or should have known of the significant risks of the lack of audited financial statements, which include:

a.  That offering proceeds from prior offerings may have been used for purposes other than stated or represented in the offering material;

b.  That assets may be overstated;

c.  That revenues may be overstated; and

d.  That offering proceeds may be used to pay promised returns to investors in prior offerings thus permitting the operation of a fraudulent Ponzi scheme.

72.  Neither the Confidential Private Placement Memorandum of the Series B-4 Striker Debentures nor the SR-12 preferred stock disclosed the risks of the lack of audited financial statements. Additionally, neither Lawrence nor Pope disclosed to the Gibbs Trust the risks of the lack of audited financial statements with respect to Striker or Provident Royalties

34

and their affiliates.

73.     In purchasing the Striker Series B Debentures the Talmage Trust, and in purchasing the Striker Series B-4 Debentures and SR-12 preferred stock the Gibbs Trust relied upon the recommendations and statements of Lawrence and Pope and the representations and the truthfulness and accuracy of the statements contained in the Confidential Private Placement Memorandum of the Striker Series B and Striker Series B-4 Debentures and SR-12 preferred stock.

74.     By causing the Talmage Trust to purchase $492,000 of Striker Series B Debentures, Lawrence and Pope caused the Talmage Trust to place virtually all of its assets into one privately held, non-liquid, high risk direct participation program investment. This investment was unsuitable for the Talmage Trust in view of the Trust, and its beneficiary, Martha W. Gibbs, risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, medical condition, and diminishing mental capabilities.

75.     Rather than advising diversification of investments, Lawrence and Pope advised and recommended concentration of the assets of the Talmage Trust and the Gibbs Trust into a single type of investment, that is, private, illiquid, high risk, oil and gas direct participation programs. Such investment advice and recommendations were unsuitable for the Talmage Trust as well as the Gibbs Trust, and their sole beneficiary, Martha W. Gibbs, in view of their risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, the medical condition of Martha W. Gibbs, and the diminishing mental capacity of Martha W. Gibbs.

76.     The Striker Series B Debentures purchased by Lawrence as Trustee of the

35

Talmage Trust, and sold to the Talmage Trust by Lawrence and Pope, were particularly unsuitable for the Talmage Trust because the terms and conditions of the Striker Series B Debentures they were only suitable for accredited investors and the Talmage Trust was not an accredited investor. Lawrence and Pope knew the Talmage Trust was not an accredited investor and therefore deceptively structured the Talmage Trust's purchase of the $492,000 of Series B Debentures through Indian Plains.

77.     As a direct and proximate result of the representations of Lawrence and Pope, the representations contained in the Private Placement Memorandum of the Striker Debenture Series B and Series B-4 Offering, and the SR-12 preferred stock, and related Subscription Agreements and documents, and in reliance upon the completeness and accuracy of such representations and the disclosures contained in such documents, the Talmage Trust and the Gibbs Trust made the investments set forth in paragraphs 45 and 46 above.

78.     Direct Capital was the managing broker-dealer and/or a broker/dealer for the Striker Series B Debenture Offering and, as such, received two percent of the gross proceeds from the sale of the Striker Debentures, including two percent of the purchase of the Talmage Trust, and, in addition, received a due diligence allowance in the amount of two percent of the gross proceeds of the Striker Series B Striker Debenture Offering.

79.     Prior to serving as the managing Broker-Dealer and/or a broker-dealer of the Striker Series B Debenture Offering Direct Capital was either a managing broker-dealer of, and/or participated as a broker-dealer in the following Striker offerings:

        a.  Striker Legacy Interests, Amber Property LLC, aggregate offering amount $32,500,000.00;

b. Striker Petroleum, LLC, Rework Program 2005, aggregate offering amount $14,200,000.00;

c. Striker Legacy Interests CJ Property LLC, aggregate offering amount $15,800,000.00; and

d. Striker Petroleum 13% Series A Senior Secured Convertible Debentures, aggregate offering amount $10,900,000.00.

80.     Prior to Direct Capital acting as the managing broker-dealer for the Striker Series B Debenture Offering, Direct Capital had participated in Striker Offerings of an aggregate amount of $73,400,000.00. These Striker offerings commenced as early as April, 2005, approximately one and one-half years prior to the Talmage Trust's purchase of the Striker Series B Debentures. One or more of these Striker offerings was part of Striker's fraudulent Ponzi scheme.

81.     As a broker-dealer participating in the offering of securities of Striker, and its subsidiaries and affiliates, and pursuant to rules of FINRA and rules of its predecessor, the NASD, Direct Capital had an obligation and a duty to conduct a reasonable due diligence investigation of Striker, its prior offering and their officers, directors and control persons.

82.     Prior to Direct Capital's participation in the Series B Debenture Offering, Direct Capital had ample opportunity to investigate the financial results and operations of the prior Striker offerings, the accuracy and reliability of Striker financial statements, and the actual use of proceeds of the prior Striker offerings in which it had participated to determine whether the proceeds were used as represented. A reasonable due diligence investigation would include a detailed examination of financial statements of Striker and its affiliates with a particular

emphasis on historical use of proceeds and the accuracy and reliability of financial information previously provided.

83.    Prior to the Series B Debenture Offering, Striker conducted the Striker Petroleum 13% Series A Senior Secured Convertible Debenture Offering in which Direct Capital participated as either the managing broker-dealer and/or a broker-dealer.  Pursuant to the provisions of the Striker Petroleum 13% Series A Senior Secured Convertible Debentures, an independent third party trustee for the benefit of the Debenture holders was required to be appointed.  A reasonable due diligence investigation of Direct Capital with respect to the Series B Debenture Offering would include an investigation of whether Striker had appointed an independent third party trustee as represented in the prior offering in which Direct Capital had participated as a managing broker-dealer and/or a broker-dealer.

84.    Had Direct Capital performed a reasonable due diligence investigation as required pursuant to FINRA rules or even a cursory due diligence investigation it would have discovered:

a.   That money used in prior offerings of Striker was not being utilized as represented but, instead, was being used to pay promised returns to investors in earlier offerings;

b.   That financial information and financial statements contained in prior offerings, as well as in the Series B Debenture Offering, were false and inaccurate;

c.   That Striker had not appointed an independent third party trustee for the benefit of the Debenture holders as represented in the Private Placement Memoranda but, instead, had appointed Steve Holmes, an officer of Striker, general counsel and/or outside legal counsel of

Striker; and

d. The debentures in prior Striker offerings were not collateralized as represented in such prior offerings.

85. Alternatively, Direct Capital did discover through a due diligence investigation or otherwise that:

a. Prior Striker offerings had not utilized proceeds as represented in the Private Placement Memoranda of such prior offerings, but were using such proceeds to pay promised returns to investors in earlier offerings;

b. That the financial data and financial statements contained in the Series B Debenture Offering, as well as that financial data and financial statements contained in prior offerings in which Direct Capital participated as a managing broker-dealer and/or a broker-dealer, were false and inaccurate;

c. That Striker had not and/or was not appointing an independent third party trustee for the Debenture holders, and/or

d. That Striker had not collateralized the Debentures of prior Striker offerings as represented.

With such knowledge, Direct Capital, through acting as a managing broker-dealer and/or a broker-dealer, knowingly disseminated Private Placement Memoranda for the Series B Debenture Offering containing material misstatements of fact and omissions to state material facts.

86. In the Series B Debenture Offering, Direct Capital either failed to inquire into those matters required in a reasonable due diligence investigation or did inquire into such

matters and learned the proceeds were not used as represented, that financial information was false and inaccurate, and/or that an independent third party trustee had not been appointed as represented in prior offerings. In either event, Direct Capital in the offer and sale of the Series B Debenture Offering as managing broker-dealer and/or broker-dealer, pursuant to which Direct Capital received substantial amounts of money, disseminated Private Placement Memoranda containing material misrepresentations of fact and omissions to state material facts.

87.     Direct Capital and Womack each owed a duty to the Talmage Trust, and all other purchasers of the Striker Series B Debentures to conduct a full, complete, thorough, prudent, and reasonable due diligence investigation (a "Due Diligence Investigation") of the Striker Debenture Offerings, Striker, its subsidiaries, related entities, and officers and directors. In fact, Direct Capital received a substantial sum of money from the Striker Series B Debentures for purportedly performing such a Due Diligence Investigation.

88.     Direct Capital and Womack breached their duty to conduct a Due Diligence Investigation and, in fact, failed to perform a Due Diligence Investigation by, among other things:

a. Not obtaining reliable financial information concerning the history and operations of Striker;

b. Not adequately determining the use of proceeds of prior Striker offerings;

c. Not requiring audited financial statements on Striker, the Legacy Offering entities, and the respective Debenture Offerings;

d. Not requiring the inclusion in the private placement memoranda disclosure of the risks associated with the lack of audited financial statements and, in particular, the risks that

the proceeds from the offerings could be, and in the case of the Striker Debentures were, in fact, used for purposes other than as stated in the private placement memoranda, effectively allowing Striker to operate a fraudulent Ponzi scheme defrauding the Talmage Trust and numerous other investors;

e. Not determining the existence of an independent third party trustee for the Debenture holders as represented in prior Striker offerings and in the private placement memorandum for the Striker Series B Debentures; and

f. Not ascertaining the lack of adequate collateralization of the Debentures in prior Striker offerings and as represented in the private placement memorandum for the Striker Series B Debenture.

89.     Direct Capital and Womack each owed a duty to the Talmage Trust and all of the purchasers of Striker Debentures to supervise all those engaged in the offer and sale of the Striker Debentures, including CapWest, which were members of the "selling group" for which Direct Capital served as the managing broker-dealer.  In fact, Direct Capital received a substantial sum of money from the sale of Striker Series B Debentures for acting as the managing broker-dealer for the selling group.

90.     Direct Capital and Womack breached their duty to supervise members of the selling group of the Striker Debentures by, among other things:

a. Not having in place adequate compliance and supervisory procedures with oversight provisions so as to prevent the fraudulent conduct engaged in by those involved in the sale of Striker Debentures and further, to reasonably protect against the sale of Striker Debentures to persons and entities unsuitable for such purchase.

41

b. Failing to conduct a reasonable or meaningful review of the sales of the Striker Debentures by CapWest so as to protect the Talmage Trust and other purchasers of Striker Series B Debentures from fraudulent conduct in the sale of such Debentures and the sale of such Debentures to persons unsuitable for the purchase of such Debentures, such as the Talmage Trust.

91.     At various times relevant to the allegations contained in this Complaint, Holmes was the Vice President, general counsel, Chief Operating Officer, outside legal counsel of Striker, and/or purported independent third party trustee of the Striker Debentures. In one or more of such roles on behalf of Striker, Holmes was intimately familiar with the business operations of Striker, its subsidiaries and affiliates, and the manner in which the Legacy Offerings and the Debenture Offerings were conducted and operated.

92.     Although not specifically identified in the private placement memoranda of the Striker Debenture Offerings as the "independent third party trustee" for the Striker Debentures, Holmes, as general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel, knew that he was to serve as the purported "independent third party trustee" for the Striker Debentures and further knew that he was neither "independent" nor "a third party." Thus, Holmes knew at the time of the Striker Debenture Offerings and, in particular, the Striker Series B Debenture Offering that the private placement memoranda were false and misleading, containing untrue statements of material fact with respect to the existence of an independent third party trustee for the Striker Series B Debenture.

93.     As general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel of Striker, and/or as the purported independent third party trustee for the Striker

42

Debenture holders, Holmes was intimately familiar with Striker's manner of operations and knew, or was reckless in not knowing, that Striker was operating a fraudulent Ponzi scheme as has been described in this Complaint.

94.     Holmes owed a duty, as general counsel, Vice President, Chief Operating Officer, and/or outside legal counsel of Striker, and as the purported independent third party trustee for the Striker Debenture holders, to purchasers of Striker Debentures, including the Striker Series B and Series B-4 Debentures, to not offer or sell the Striker Debentures through use of private placement memoranda containing untrue statements of material fact and omissions to state material facts as alleged in this Complaint. Holmes breached this duty to the Trusts, and other Debenture purchasers, by, as general counsel, outside legal counsel, Chief Operating Officer, and/or Vice President for Striker, and/or as the purported independent third party trustee for the Striker Debenture holders, being a primary and material participant in Striker's fraudulent Ponzi scheme and by aiding and abetting Striker's fraudulent Ponzi scheme by, including but not limited to, participation in the preparation of and dissemination of Confidential Private Placement Memoranda containing untrue statements of material facts and omissions of material facts as alleged in this Complaint.

95.     In the Striker Series B Debenture Offering, Hancock is identified as the "Chief Financial Officer" of Striker. A Ponzi scheme is a blatant financial fraud. A chief financial officer has overall responsibility for financial matters and for financial operations of the company for which he acts as chief financial officer. As the Chief Financial Officer of Striker, Hancock knew, or if he lacked actual knowledge, was reckless in not knowing, of the operation of Striker's fraudulent Ponzi scheme as described in this Complaint. As the Chief Financial

43

Officer of Striker, Hancock was a primary actor and material participant, directly and/or indirectly, managing and handling the financial affairs of Striker, the Legacy Offerings, and the Debenture Offerings and their proceeds and revenues. Thus, not only did Hancock aid and abet Striker's fraudulent Ponzi scheme, but Hancock was a direct participant in Striker's fraudulent Ponzi scheme directly and proximately causing the losses sustained by the Trusts in the investments in the Striker Series B Debenture.

96.     As the Chief Financial Officer of Striker, Hancock was intimately familiar with Striker's manner of operation and, in particular, its financial manner of operation and knew or was reckless in not knowing that Striker was operating a fraudulent Ponzi scheme as has been described in this Complaint.

97.     Hancock owed a duty, as the Chief Financial Officer of Striker, to purchasers of Striker Debentures, including Striker Series B Debentures, not to offer or sell Striker Debentures through use of Private Place Memoranda containing untrue statements of material facts and omissions to state material facts as alleged in this Complaint. Hancock breached this duty to the Talmage Trust and other purchasers by, as Chief Financial Officer being a primary and material participant in Striker's fraudulent Ponzi scheme and by aiding and abetting Striker's fraudulent Ponzi scheme, including but not limited to participation in the preparation of and dissemination of Confidential Private Placement Memoranda containing untrue statements of material fact and omissions of material fact as alleged in this Complaint.

98.     Secore & Waller drafted most, if not all, of all the private placement memoranda of the Provident offerings, including the private placement memorandum of SR-12. As such, in addition to Provident being a client of Secore & Waller, each of the Shale Royalties entities,

including SR-12, for whom Secore & Waller drafted private placement memoranda, was a client of Secore & Waller.

99.    In drafting the private placement memoranda, Secore & Waller knew that the Private Placement Memoranda was to be distributed nationwide to numerous potential investors and ultimately investors and purchasers of preferred stock of SR-12.  In drafting the private placement memoranda, Secore & Waller owed a duty not only to its clients, but to those who foreseeably would rely upon the Private Placement Memoranda in making significant investment decisions, to conduct a reasonable and prudent Due Diligence Investigation into the accuracy and completeness of the information contained in the private placement memoranda. Further, Secore & Waller owed a duty not only to its client, but to those persons who would foreseeably rely upon the private placement memoranda in making significant investment decisions, to disclose material risks of the offering and to not fail to disclose material facts.

100.    Secore & Waller knew, or were reckless in not knowing, that neither Provident, nor any of the Shale Royalties/Provident entities for which Secore & Waller prepared private placement memoranda, had audited financial statements.  As attorneys, who hold themselves out as experts in the field of transactional securities, Secore & Waller knew, or were reckless in not knowing, that one of the risks of not having audited financial statements of the promoter, and previous entity offerings by the promoter, is the comingling of money, improper use of proceeds, and the possible operation of a fraudulent Ponzi scheme.

101.    Competent transactional securities attorneys, acting reasonably and prudently, would have recognized, as a clear warning and red flag, the existence of a significant risk of the comingling of money and possible operation of a fraudulent Ponzi scheme by virtue of

45

Provident's numerous consecutive entity offerings, with two or three of such offerings being "open" and being offered at the same time. Even though such a clear warning existed, Secore & Waller either knowingly ignored such warnings, or were reckless in their failure to recognize such clear warnings of a possible fraudulent Ponzi scheme, and to have then included within the private placement memoranda adequate disclosure of such risk.

102.    The drafting of the private placement memoranda was an integral part of the fraudulent Ponzi scheme perpetrated by Provident and but for the drafting of private placement memoranda, which by all appearances, presented a picture of a legitimate business enterprise purporting to disclose all material facts to investors, Provident could not have so successfully perpetrated its fraudulent scheme upon the Trusts and numerous others. Thus, not only did Secore & Waller aid and abet the fraudulent Ponzi scheme of Provident but, was, along with Provident, a primary actor and material participant in Provident's fraudulent Ponzi scheme.

## FIRST CLAIM FOR RELIEF
## (15 U.S.C. § 78j(b) and C.F.R. § 240b-5)

103.    Paragraphs 1 through 102 of this Complaint are re-alleged and incorporated by reference herein.

### Preliminary Allegations

104.    Each of the Defendants against whom this Claim for Relief is brought is a person as defined by 15 U.S.C. § 78c(a)(9).

105.    Each of the DPP Investments described in this Complaint is a security within the meaning of 15 U.S.C. § 78c(a)(10).

106.    In offering and selling the above-described securities to the Trusts, the Defendants made use of means and instrumentalities of interstate commerce, including but not

limited to, the U.S. mails, the telephone, the internet, and/or private commercial interstate carriers.

**Striker Debentures**

107.    In offering and selling to the Trusts the Striker Debentures, Lawrence, Pope, Personal Money Management, CapWest, Direct Capital (Series B Debentures only), Holmes, and Hancock (Series B Debentures only) employed one or more devices, schemes, and artifices to defraud the Trusts, as set forth hereinabove and additionally, including but not limited to:

        a.    Knowingly and/or recklessly failing to conduct a Due Diligence Investigation into Striker and its various offerings and thus failing to warn the Trusts of the existence and/or the possibility that they were investing in a fraudulent Ponzi scheme;

        b.    The failure to disclose material facts as set forth herein;

        c.    The making of untrue statements of material fact as set forth herein; and

        d.    The sale of unsuitable investments to the Trusts in view of the risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, medical condition and diminishing mental capacity of the Trusts' sole beneficiary, Martha W. Gibbs, all of the foregoing being for the purpose of earning a commission and other forms of compensation upon the sale of the DPP Investments to the Trusts.

108.    In connection with the offer and sale of the Striker Debentures to the Trusts, Lawrence, Pope, Personal Money Management, CapWest, Direct Capital, (Series B Debentures only), Holmes, and Hancock (Series B Debentures only) each made untrue statements of material fact to the Trusts as set forth hereinabove and additionally as follows:

        a.    Lawrence, Pope, and Personal Money Management, through Pope, made the

47

untrue statements in material fact as set forth above;

b.  Lawrence, Pope, Personal Money Management, CapWest, Direct Capital (Series B Debentures only), Holmes, and Hancock (Series B Debentures only) made untrue statements of material fact through the Striker Series B and Series B-4 Debenture Confidential Private Placement Memorandum as set forth above and additionally, including but not limited to:

i.  That the proceeds from the purchase of the Debentures would be used as set forth in the Private Placement Memorandum, rather than for other purposes, including but not limited to, the payment of promised returns to investors in the Legacy Offerings and prior Debenture Offerings;

ii.  That there existed an independent third party trustee for the Debenture holders when, in fact, there was not an independent third party trustee for the Debenture holders;

iii.  That the offering proceeds would be used primarily to acquire, develop, and operate oil and gas properties, and for working capital when, in fact, the proceeds were used for other purposes;

iv.  That the assets of Striker were as represented in the unaudited financial statements accompanying the private placement memoranda when, in fact, the assets were significantly overstated; and

v.  That the revenue of Striker was as represented in the unaudited financial statements accompanying the private placement memoranda when, in fact, the revenue was significantly overstated.

109.  Through the Striker Series B and Series B-4 Offering Documents, Lawrence,

Pope, Personal Money Management, CapWest, Direct Capital (Series B Debentures only), Holmes, and Hancock (Series B Debentures only) omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth hereinabove.

110.     Each of Lawrence, Pope, Personal Money Management, CapWest, Direct Capital (Series B Debentures only), Holmes, and Hancock (Series B Debentures only) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Trusts in connection with the purchase and sale of the Striker Series B and Series B-4 Debentures by, among other things:

a.   Deceptively structuring the Talmage Trust's purchase of the Striker Series B Debentures through Indian Plains and/or failing to conduct a reasonable investigation into the Indian Plains Subscription Agreement for the $492,000.000 purchase of Series B Debenture to ascertain the source of funds for the purchase and the identity of the real purchaser.

b.   Recommending and selling to the Trusts, unsuitable investments consisting of the Striker Debentures;

c.   Engaging in the acts, practices and course of conduct described herein resulting in Striker's operation of a fraudulent Ponzi scheme; and

d.   Lawrence and Pope causing almost one hundred percent of the Talmage Trust's assets and a significant amount of the Gibbs Trust's assets to be invested in speculative, high risk, illiquid direct participation program investments, more than eighty-two percent of which consisted of Striker Debentures, for the purpose of earning higher commissions and other income.

**Provident Preferred Stock**

111.    Lawrence, Pope, Professional Money Management, CapWest, and Secore & Waller employed a device, scheme and/or artifice to defraud the Trusts in their purchase of and SR-12 preferred stock as set forth hereinabove and additionally, including but not limited to:

a.    The failure to conduct a Due Diligence Investigation of Provident and those offerings which preceded SR-12, including the failure to obtain audited financial statements of Provident and each of the entities preceding SR-12 or other accurate and reliable financial information upon such entities;

b.    The failure to disclose to purchasers of preferred stock in SR-12, including the Trusts, the risks of the lack of audited financial statements of Provident and those offerings preceding SR-12, including but not limited to:

i.    That investors' money in the various offerings of Provident may be comingled;

ii.    That money of SR-12 may be used for purposes other than those stated in the private placement memorandum, and that money from other prior offerings had been used for numerous purposes other than those stated in the private placement memoranda of prior offerings;

iii.    That money from the SR-12 offering may be used to pay promised returns to purchasers of investments in prior offerings, rather than for the purposes stated in the private placement memorandum of SR-12; and

iv.    That although investors in SR-12, as well as prior offerings, were told that approximately eighty-six percent of investment proceeds was to be allocated for oil and gas

50

investments, in fact, much less than eighty-six percent of investor proceeds was actually allocated to oil and gas investments.

c. Secore & Waller, as attorneys and purported experts in transactional securities, either knew, or recklessly ignored warning signs that the Provident offerings were or may be fraudulent Ponzi schemes and failed to include any such warning in the private placement memoranda which they drafted for SR-12.

112. In connection with the offer and sale of preferred stock in SR-12 to the Trusts, Lawrence, Pope, Professional Money Management, CapWest, and Secore & Waller made untrue statements of material fact to the Trusts, either directly and/or through the private placement memoranda of SR-12, as set forth hereinabove and additionally, including but not limited to:

a. That the proceeds from the sale of the preferred stock would be used for the purposes stated in the private placement memoranda of SR-12 when, in fact, the proceeds were used for other purposes; and

b. That the preferred stock sold in SR-12 would be collateralized as represented in the private placement memoranda when, in fact, it was not.

113. Lawrence, Pope, Personal Money Management, CapWest, and Secore & Waller omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading in the offer and sale of preferred stock in SR-12 to the Trusts, as set forth hereinabove and additionally, including but not limited to, the following:

a. The risks of lack of audited financial statements of Provident and the offerings

51

of preferred stock in entities preceding SR-12;

      b.   That some or all the proceeds from the sale of preferred stock in SR-12 would be used to pay promised returns to purchasers of preferred stock in other investments and offerings preceding SR-12; and

      c.   That substantial amounts of the offering proceeds from SR-12 would be used for purposes other than the purchase of oil and gas interests as described in the private placement memoranda.

      114.   Lawrence, Pope, Personal Money Management, CapWest, and Secore & Waller engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the Trusts in connection with their purchase of the preferred stock in SR-12, as set forth hereinabove and additionally, including but not limited to:

      a.   Secore & Waller knew, and/or recklessly ignored, obvious warning signs that Provident, through SR-12, and numerous other entities which Secore & Waller incorporated, for which Secore & Waller prepared private placement memoranda, and for which Secore & Waller filed Form D, Notice of Sale of Securities Pursuant to Regulation D, Section 4(6) and/or Uniform Limited Offering Exception (Form D) on behalf of SR-12 and 20 other Provident offerings for the purpose of avoiding Federal and State security registration requirements, was operating a fraudulent Ponzi scheme in which investor money from later offerings was used to pay promised returns to investors in earlier offerings, and failed to make any disclosure of the risks thereof.  Secore & Waller knew that a requirement of registration of the preferred stock of SR-12, and the other Provident entities was audited financial statements which would have revealed Provident's fraudulent Ponzi scheme;

b. All of the Defendants identified in this paragraph failed to conduct a Due Diligence Investigation, including but not limited to, demanding or requesting audited financial statements or other adequate and reliable financial information which would have revealed the true financial picture of Provident and the various offerings which it conducted; and

115. The Trusts relied upon the representations of the Defendants including the representations contained in the written documents and materials provided to the Trusts in the purchase of the DPP Investments. Such reliance was justified.

116. As a direct and proximate result of Defendants' acts and conduct in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, the Trusts purchased the DPP Investment securities described herein and have suffered a loss upon such investments.

## SECOND CLAIM FOR RELIEF
### (15 U.S.C. § 78t(a))

117. Paragraphs 1 through 116 of this Complaint are re-alleged and incorporated by reference herein.

118. CapWest and Pope are directly or indirectly controlled by Capstone, Colorado Capital, Hall, and White.

119. Capstone, Colorado Capital Holding, Hall, and White are, pursuant to 15 U.S.C. § 78t(a), jointly and severally liable with and to the same extent as CapWest and Pope for their violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

120. TIC Capital, Womack, Pacific Security, and Pacific Security Partners, directly or indirectly control Direct Capital.

53

121.   TIC Capital, Womack, Pacific Security, and Pacific Security Partners are pursuant to 15 U.S.C. § 78t(a) jointly and severally liable with, and to the same extent as Direct Capital, for its violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF
### (15 U.S.C. § 77l(a)(2))

122.   Paragraphs 1 through 121 of this Complaint are re-alleged and incorporated by reference herein.

123.   Security purchases which are the subject of this Third Claim For Relief are as follows:

| Investment | Investment Date | Amount of Investment | Purchaser |
|---|---|---|---|
| Striker Petroleum, LLC Series B-4 Debenture | June 20, 2008 | $135,000.00 | Gibbs Trust |
| Shale Royalties 12, Inc. Preferred Stock | June 26, 2008 | 135,000.00 | Gibbs Trust |
| TOTAL | | $270,000.00 | |

124.   Through on or about December of 2008 the Gibbs Trust received monthly payments upon the Series B-4 Debentures and the SR-12 preferred stock as represented in the Private Placement Memorandum. In approximately January of 2009 monthly payments upon the Series B-4 Debentures and SR-12 preferred stock ceased. Subsequently, on or about July1, 2009 the Shale Royalties Litigation was filed and on or about December 3, 2009 the Striker Litigation was filed. The Gibbs Trust did not actually discover the untruths or omissions alleged herein concerning the Series B-4 Debentures and SR-12 preferred stock until on or about the filing date of the Shale Royalties Litigation and the filing date of the Striker Litigation. The Gibbs Trust could not have reasonably discovered the untruths or omissions

prior to such dates because on or about January of 2009 and continuing to the present time, Martha W. Gibbs, the trustee and sole beneficiary, was suffering from significant physical disabilities and a diminished mental capability.

125. The Gibbs Trust has brought this Claim For Relief within the applicable Statutes of Limitations of 15 U.S.C. § 77m in that not more than one year has transpired since discovery of the untrue statements and omissions, or after such discovery should have been made in the exercise of reasonable diligence, and not more than three years has transpired since the date of sale.

126. In violation of 15 U.S.C. § 77l(a)(2), as set forth herein, by means and instruments of transportation and communication in interstate commerce, and the mails, by means of a prospectus and oral communications, which included untrue statements of material fact and omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, the Gibbs Trust not knowing of such untruths and omissions, Lawrence, Pope, Personal Money Management, and CapWest offered and sold to the Gibbs Trust one or more of the DPP Investments identified in paragraph 122, in the manner and means set forth herein.

127. The Gibbs Trust is entitled to recover, from each of the persons and entities set forth in the immediately preceding paragraph, the consideration paid for the securities purchased, with interest thereon, less any income received thereon, and hereby tenders back to such persons, all such securities purchased.

## FOURTH CLAIM FOR RELIEF
## (15 U.S.C. § 77o)

128.    Paragraphs 1 through 127 of this Complaint are re-alleged and incorporated by reference herein.

129.    Capstone, Colorado Capital, and Hall, by or through stock ownership, agency or otherwise or, in connection with an agreement and/or understanding among one or more of them, control CapWest and Pope, persons liable pursuant to 15 U.S.C. § 77l(a)(2).

130.    Capstone, Colorado Capital, and Hall are pursuant to 15 U.S.C. § 77o jointly and severally liable with, and to the same extent, as CapWest and Pope for their violation of 15 U.S.C. § 77l.

## FIFTH CLAIM FOR RELIEF
## (Wyoming Securities Act)

131.    Paragraphs 1 through 130 of this Complaint are re-alleged and incorporated by reference herein.

132.    Security purchases which are the subject of this Third Claim For Relief are as follows:

| Investment | Investment Date | Amount of Investment | Purchaser |
|---|---|---|---|
| Striker Petroleum, LLC Series B-4 Debenture | June 20, 2008 | $135,000.00 | Gibbs Trust |
| Shale Royalties 12, Inc. Preferred Stock | June 26, 2008 | 135,000.00 | Gibbs Trust |
| TOTAL | | $270,000.00 | |

### Sale of Unregistered Securities

133.    WS § 17-4-107 makes it lawful for any person to offer or sell a security in the

State of Wyoming unless it is either:

> a.  Registered under the Wyoming Securities Act;
>
> b.  The security or transaction is exempt under WS § 17-4-114; or
>
> c.  It is a "covered security."

134.    On or about the dates set forth in paragraph 132 above, Lawrence, Pope, Personal Money Management, and CapWest offered and sold to the Gibbs Trust the securities identified in paragraph 131 above.

135.    The securities identified in paragraph 132 above are securities within the meaning of WS § 17-4-113(a)(xi).

136.    The securities identified in paragraph 132 above sold to the Gibbs Trust were not registered under the Wyoming Securities Act, exempt for registration pursuant to WS § 17-14-114 or a covered security within the meaning of WS § 17-4-113(a)(xiii).

137.    Pursuant to WS § 17-14-122(a), Lawrence, Pope, Personal Money Management, and CapWest are liable to the Trusts for the amount paid by the Gibbs Trust for the purchase, together with interest at the rate of six percent per year from the date of payment, together with costs and attorney's fees.

**Sale of Securities by Unregistered Agent**

138.    Pursuant to the definition contained in WS § 17-4-113(a)(ii), Lawrence is an "agent."

139.    Lawrence has never registered as an "agent" under the provisions of the Wyoming Securities Act.

140.    On or about the dates set forth in paragraph 132 above, Lawrence, as an "agent"

57

within the meaning of WS § 17-4-113(a)(ii), and in violation of WS § 17-4-103(a), transacted business in the State of Wyoming consisting of the offer and sale to the Gibbs Trust of the securities identified in paragraph 132 above.

141.    Pursuant to WS § 17-14-122(a) Lawrence is liable to the Gibbs Trust for the amount paid by the Gibbs Trust for the purchase of the securities identified in paragraph 132, together with interest at the rate of six percent per year from the date of payment, together with costs and attorney's fees.

## Fraud in Connection with the Sale of Securities

142.    In connection with the offer and sale of the securities described in paragraph 131 above, and as set forth herein, Lawrence, Pope, Personal Money Management, CapWest, Secore & Waller (SR-12 only), and Holmes (Series B-4 Debentures only), offered and sold such securities by means of untrue statements of material fact and omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, the Gibbs Trust not knowing of such untruths and omissions.

143.    In connection with the offer and sale of the SR-12 preferred stock to the Gibbs Trust, Secore & Waller aided and abetted Provident and SR-12, along with Lawrence, Pope, and CapWest, in the offer and sale of the preferred stock in SR-12 to the Gibbs Trust. Such aiding and abetting includes, but is not limited to, the following:

a.   The failure to do a Due Diligence Investigation of Provident and the entities offered by Provident preceding SR-12. Secore & Waller's Due Diligence Investigation failures include, but are not limited to the following:

i.   The failure to require audited financial statements on Provident and the

58

entities offered by Provident preceding SR-12;

   ii. The failure to disclose in the private placement memorandum drafted by Secore & Waller, the risks associated with the lack of audited financial statements of Provident and the entities offered by Provident preceding SR-12; and

   iii. Ignoring clear warning signs of a possible fraudulent Ponzi scheme consisting of multiple on-going offerings with no audited financial statements or other reliable financial information adequately documenting the use of proceeds of each offering conducted by Provident.

  144. In order to sell the preferred stock of SR-12, as well as the continual and on-going offers conducted by Provident, it was necessary to obtain a law firm to prepare private placement memoranda which at least in form created an appearance of a legitimate offering of SR 12 and the operation of a legitimate business enterprise by Provident. Thus, Secore & Waller was instrumental in aiding and abetting Provident, SR-12, and all those involved in the offer and sale of the preferred stock of SR-12, including but not limited to, Lawrence, Pope, and CapWest, to the Gibbs Trust.

  145. Pursuant to WS § 17-4-122(a), each of Lawrence, Pope, Personal Money Management, CapWest, Secore & Waller (SR-12 only), and Holmes (Series B-4 Debentures only) are liable to the Gibbs Trust for the consideration paid for the security purchased together with interest at six per cent per year from the date of payment, together with costs and reasonable attorney's fees.

**Controlling Person Liability**

  146. Capstone, Colorado Capital, and Hall directly or indirectly control CapWest,

and Pope, who are sellers of the securities described in paragraph 132 above, and liable under WS § 17-4-122(a) and, pursuant to WS § 17-4-122(b), are jointly and severally liable with, and to the same extent, as Pope and CapWest.

## SIXTH CLAIM FOR RELIEF
### (Texas Securities Act)

147.    Paragraphs 1 through 146 of this Complaint are re-alleged and incorporated by reference herein.

148.    The Series B Debenture and the SR-12 preferred stock are securities within the meaning of Vernon's Ann., Tex. Civ. St., Art. 581-4A.  Each of the Plaintiffs and each of Defendants Direct Capital, Womack, TIC Capital, Pacific Security Partners, Pacific Security, and Secore & Waller are a person within the meaning of Vernon's Ann., Tex. Civ. St., Art. 581-4B.

149.    In violation of Vernon's Ann., Tex. Civ. St., Art. 581-33A(2), Direct Capital, Holmes, and Hancock offered and sold the securities consisting of Striker Series B Debentures in the amount of $492,000.00 to the Talmage Trust on or about November 3, 2006 by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in this Complaint.

150.    In violation of Vernon's Ann., Tex. Civ. St., Art. 581-33A(2), SR-12 and Provident offered and sold securities consisting of preferred stock of SR-12 to the Gibbs Trust on or about June 26, 2008 by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in this Complaint.

151.    Womack, TIC Capital, Pacific Security Partners, and Pacific Security are persons who directly or indirectly control Direct Capital, the seller of the Series B Debentures to the Talmage Trust, and pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33F(1) are jointly and severally liable with Direct Capital and liable to the extent as if they were the seller.

152.    Womack, TIC Capital, Pacific Security Partners, and Pacific Security are each a person who directly or indirectly, with the intent to deceive or defraud, or with reckless disregard for the truth or the law, materially aided Direct Capital, a seller of the Series B Debentures to the Talmage Trust, and are jointly and severally liable with and to the same extent as Direct Capital, pursuant to Vernon's Ann, Tex. Civ. St., Art. 581-33F(2).

153.    Direct Capital, Womack, TIC Capital, Pacific Security Partners, Pacific Security, Holmes, and Hancock are each a person who directly or indirectly, with intent to deceive or defraud, or with reckless disregard for the truth or the law, materially aided Striker, a seller of the Series B Debentures, and are jointly and severally liable with and to the same extent as Striker, pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33F(2).

154.    Secore & Waller is a person who directly or indirectly, with intent to deceive or defraud, with reckless disregard for the truth or the law, materially aided SR-12 and Provident sellers of the preferred stock of SR-12, and are jointly and severally liable with and to the same extent as SR-12 and Provident, pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33F(2).

155.    Through on or about December of 2008, the Talmage Trust received monthly payments on the Series B Debentures, and the Gibbs Trust received monthly payments on the SR-12 preferred stock, as represented in the private placement memoranda of each and pursuant to verbal representations as alleged in this Complaint. In January of 2009, monthly

payments upon the Series B Debentures and SR-12 preferred stock ceased. Subsequently, on July 1, 2009 the Shale Royalties Litigation was filed and on December 3, 2009 the Striker Litigation was filed. The Gibbs Trust did not actually discover the untruths and omissions alleged herein until on or about July 1, 2009, upon the filing of the Shale Royalties Litigation. The Talmage Trust did not actually discover the untruths and omissions alleged herein until on or about December 3, 2009, upon the filing of the Striker Litigation. The Talmage Trust and the Gibbs Trust could not have reasonably discovered the untruths or omissions prior to January of 2009, when payments upon the Series B Debentures in Striker and the SR-12 preferred stock ceased, as until such time there were no indications of the untruths or omissions of Striker's fraudulent Ponzi scheme.

156.    The Talmage Trust and the Gibbs Trust have brought this claim for relief within the applicable statute of limitations contained in Vernon's Ann., Tex. Civ. St., Art. 581-33H(2) in that not more than three years has transpired since discovery of the untruth or omission or after discovery should have made in the exercise of reasonable diligence or more than five years after the sale.

157.    The Talmage Trust still owns the Series B Debentures and the Gibbs Trust still owns the SR-12 preferred stock and thus seek rescission and are entitled to the amount paid for the Series B Debentures and SR-12 preferred stock plus interest thereon at the legal rate from the purchase date, less the amount of income received, plus costs and reasonable attorney's fees pursuant to Vernon's Ann., Tex. Civ. St., Art. 581-33D(1), (6) and (7).

## SEVENTH CLAIM FOR RELIEF
### (Colorado Securities Act)

158.    Paragraphs 1 through 157 of this Complaint are re-alleged and incorporated by

reference herein.

159.    Each of the investments described in paragraphs 45 and 46 above are securities within the meaning of C.R.S.A. § 11-51-201(17).  Each of the Plaintiffs and each of Defendants Pope, CapWest, Personal Money Management, Capstone, Colorado Holdings, Hall, and White are persons within the meaning of C.R.S.A. §11-51-201(12).

160.    In violation of C.R.S.A. §11-51-604(4), CapWest, Pope, and Personal Money Management through Pope offered and sold securities consisting of Striker Series B Debentures in the amount of $492,000.00 to the Talmage Trust on or about November 3, 2006, Striker Series B-4 Debentures in the amount of $135,000.00 to the Gibbs Trust on or about June 20, 2008, and SR-12 preferred stock in the amount of $135,000.00 to the Gibbs Trust on or about June 26, 2008 by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light the circumstances under which they were made, not misleading, as alleged in this Complaint.

161.    In violation of C.R.S.A. § 11-61-604(3), CapWest, Pope, and Personal Money Management through Pope recklessly, knowingly, or with an intent to defraud, sold to the Trusts the investments described in paragraphs 45 and 46 of this Complaint on the dates set forth in paragraphs 45 and 46 of this Complaint in violation of C.R.S.A. § 11-51-501(1) by:

a.    Employing one or more devices, schemes, or artifices to defraud the Trusts as alleged in this Complaint;

b.    By means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in this Complaint;

c. Engaged in acts and practices in the course of business which operated as a fraud and deceit upon the Trusts, as alleged in this Complaint.

162.    Each of Capstone, Colorado Capital, Hall and White directly or indirectly controlled CapWest, Pope, and Personal Money Management, each a person liable under C.R.S.A. § 11-51-604(3) and/or (4) and pursuant to C.R.S.A. §11-51-604(5)(b) are jointly and severally liable with and to the same extent as CapWest, Pope, and Personal Money Management for their violations of C.R.S.A. §11-51-604(3) and/or (4)

163.    CapWest directly or indirectly controlled Pope and Personal Money Management, each a person liable under C.R.S.A. § 11-51-604(3) and/or (4), and pursuant to C.R.S.A. § 11-51-604(5)(b) is jointly and severally liable with and to the same extent as Pope and Personal Money Management for their violation of C.R.S.A. .§ 11-51-604(3) and/or (4).

164.    Through on or about December of 2008, the Trusts received monthly payments upon the Series B Debentures, Series B-4 Debentures, and SR-12 preferred stock as represented in the Private Placement Memoranda. In January of 2009, monthly payments upon the Series B Debentures, Series B-4 Debentures, and SR-12 preferred stock ceased. On July 1, the Shale Royalty Litigation was filed and on December 3, 2009 the Striker Litigation was filed. The Trusts did not actually discovery the untruths or omissions alleged herein until on or about the filing of the Shale Royalty Litigation and the Striker Litigation Complaints. The Trusts could not have reasonably discovered the untruths or omissions prior to January of 2009, when payments upon the Series B Debentures, Series B-4 Debentures, and SR-12 preferred stock ceased, as until such time there was no indications of the untruths or omissions of Striker's and Provident's fraudulent Ponzi schemes.

165.    The Trusts have brought this Claim For Relief within the applicable Statute of Limitations contained in C.R.S.A. §11-51-604(8), in that not more than three years has transpired since discovery of the untruths or omissions or after discovery should have been made in the exercise of reasonable diligence, or more than five years after the sale.

166.    Pursuant to C.R.S.A. §11-51-604(3)and (4), the Trusts are entitled to an award of the amount paid for the Series B Debentures, Series B-4 Debentures, and SR-12 preferred stock, plus interest thereon at the legal rate from the purchase date, less the amount of income received, plus reasonable costs and attorney's fees.

**EIGHTH CLAIM FOR RELIEF**
**(Professional Negligence – Dennis R. Lawrence)**

167.    Paragraph 1 through 166 of this Complaint are re-alleged and incorporated by reference herein.

168.    Lawrence is a certified public accountant licensed in the State of Wyoming. Lawrence holds himself out not only as a professional accountant but as a person knowledgeable and sophisticated in financial and investment matters.  As part of his accounting practice, Lawrence provides financial and investment advice to his accounting clients.

169.    Lawrence acted as the Trustee of the Talmage Trust from November 3, 2006 through June 4, 2010.

170.    Due to his position as an accountant, Lawrence was privileged to personal and private financial information of his clients, including the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs individually, all of whom were his clients, and for whom he performed professional accounting work.  In the course of performing professional accounting work, as alleged herein, Lawrence provided financial and investment advice to the Talmage Trust, the

Gibbs Trust, and Martha W. Gibbs individually, and acted as Trustee of the Talmage Trust.

171.    Based upon the accountant-client relationship between Lawrence and the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs, the investment advisor-client relationship between Lawrence and the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs, and Lawrence acting as Trustee of the Talmage Trust, Lawrence owed to the Talmage Trust, the Gibbs Trust, and Martha W. Gibbs individually, as the beneficiary of the Gibbs Trust and the Talmage Trust, that degree of care, skill, diligence, and knowledge commonly possessed by reasonable, careful, and prudent accountants, financial advisors, and trustees in Wyoming and a fiduciary duty. These duties include, but are not limited to:

a.  As the Trustee of the Talmage Trust, to only make conservative and suitable investments on behalf of the Talmage Trust, and its sole beneficiary, Martha W. Gibbs, in view of their risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, disabled physical capabilities, and diminishing mental capabilities.

b.  Acting honestly and ethically in the making of investments as Trustee of the Talmage Trust and refraining from engaging in deceptive acts and practices as Trustee of the Talmage Trust.

c.  To provide to the Talmage Trust and the Gibbs Trust suitable financial and investment advice in view of the risk tolerance, time horizon, investment knowledge, investment experience, income needs, liquidity needs, medical condition, and mental condition of the Trusts' sole beneficiary, Martha W. Gibbs, all of which Lawrence was privy to based upon his accountant-client relationship, the financial and investment advisor- client relationship and the Trustee relationship with the Talmage Trust.

172.    Lawrence breached his professional duties which he owed to the Talmage Trust and the Gibbs Trust, and breached the fiduciary duty which he owed to the Talmage Trust and the Gibbs Trust, in numerous ways, including but not limited to the following:

a.    Engaging in deceptive acts, practices and conduct in structuring the Talmage Trust's purchase of the Striker Series B Debentures through Indian Plains so as to permit the Talmage Trust, an unaccredited investor, to purchase securities only suitable for accredited investors;

b.    Recommending, selling, and/or participating in the sale of the DPP Investments described herein to the Talmage Trust and the Gibbs Trust.  In the case of the Talmage Trust, the DPP Investments consisted of virtually of the assets of the Talmage Trust, and in the case of the Gibbs Trust, consisted of a substantial amount of the assets of the Gibbs Trust.  The DPP Investments were made by converting conservative suitable investments then held by the Talmage Trust and the Gibbs Trust into high risk, illiquid investments which ultimately resulted in a total loss.

c.    With full knowledge of the assets of the Talmage Trust and the Gibbs Trust, Martha W. Gibbs' disabled physical condition and diminishing mental capacity, offered, sold and/or participated in the sale of high risk, unsuitable, illiquid investments, all of which were a fraudulent Ponzi scheme, to the Talmage Trust and the Gibbs Trust.

d.    Failure to do a Due Diligence Investigation of the DPP Investments.    In particular, as an accountant, Lawrence should have immediately recognized the significance of the lack of any audited financial statements in connection with the DPP Investment offerings. Lawrence was aware that the DPP Investments purchased by the Talmage Trust and the Gibbs

Trust were but ones of series and should have recognized the significant risks of such DPP Investments lacking audited financial statements.

        e. Instead of advising and recommending diversification of the Talmage Trust and the Gibbs Trust's investments, which were well diversified prior to their purchase of the DPP Investments, Lawrence advised, recommended, and caused the Talmage Trust and the Gibbs Trust to concentrate their investments into private, high risk, illiquid direct participation programs, solely in the oil and gas industry.

173.    As described herein, Lawrence breached the standard of care applicable to his profession and breached the fiduciary duty owed to the Talmage Trust and the Gibbs Trust. As a direct and proximate result of such professional negligence of Lawrence, the Talmage Trust and the Gibbs Trust have sustained a loss upon the DPP Investments as set forth herein together with the incurrence of significant costs and attorney's fees incurred in recovering such investment losses.

## NINTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty– Dennis R. Lawrence)

174.    Paragraph 1 through 173 of this Complaint are re-alleged and incorporated by reference herein.

175.    Lawrence served as the Trustee of the Talmage Trust from November 3, 2006 to June 4, 2010. Martha W. Gibbs, the beneficiary of the Talmage Trust, and the Gibbs children, the contingent beneficiaries of the Gibbs Trust, on or about April 15, 2010, requested that Lawrence resign as the Trustee. Lawrence initially refused to resign as Trustee of the Talmage Trust. Upon continuing requests of Martha W. Gibbs and the Gibbs children to resign as Trustee, Lawrence then offered to resign only in the event that Martha W. Gibbs and the Gibbs

children fully released Lawrence from any and all claims which the Talmage Trust may have against him. Martha W. Gibbs and the Gibbs children refused to release Lawrence from any and all claims the Talmage Trust may have against him based upon the discovery of significant claims which the Talmage Trust possessed against Lawrence. Upon the continued requests of Martha W. Gibbs and the Gibbs children, on or about June 4, 2010, Lawrence finally agreed to resign without the benefit of a release of claims from the Talmage Trust.

176.     As Trustee for the Talmage Trust, Lawrence occupied a position of trust and confidence and as the Trustee, was a fiduciary of the Talmage Trust, and its then sole primary beneficiary, Martha W. Gibbs.

177.     As Trustee for the Talmage Trust, Lawrence owed to the Talmage Trust the fiduciary duty of honesty, good faith, fair dealing, and fulfillment of his duties as a Trustee, in an honest and good faith manner for the benefit of the Talmage Trust and its sole beneficiary Martha W. Gibbs.

178.     Lawrence breached the fiduciary duty which he owed to the Talmage Trust in ways, including the following:

a.   Advising, recommending, and causing the Talmage Trust to liquidate its portfolio of conservative, diversified, fixed income investments which were suitable for the Talmage Trust, and its beneficiary, Martha W. Gibbs, and to instead invest virtually all of the Talmage Trust's assets, consisting of approximately $492,000, into one private direct participation program investment which was illiquid, high risk, and speculative, that being, the Series B Debentures.

b.   Lawrence structured the Talmage Trust's purchase of the Series B Debentures in

a false and deceptive manner.  Lawrence knew that, at a minimum, a purchaser of Series B

Debentures was required to be an "accredited investor" and Lawrence knew that the Talmage

Trust was not an "accredited investor."  Therefore, as a deceptive act and practice, Lawrence

placed the Talmage Trust's money into Indian Plains upon the belief that Indian Plains was an

"accredited Investor" and caused Indian Plains to purchase the Series B Debentures for the

benefit of the Talmage Trust.

      179.    As a direct and proximate result of the breach of fiduciary duty of Lawrence, the

Talmage Trust has suffered a loss upon the Series B Debentures which they purchased, together

with costs and attorney's fees incurred herein in recovering such amounts.

**TENTH CLAIM FOR RELIEF**
**(Professional Negligence of Randall Pope)**

      180.    Paragraphs 1 through 179 of this Complaint are re-alleged and incorporated by

reference herein.

      181.    At all times relevant hereto, Pope was a registered representative with FINRA

and/or its predecessor, the National Association of Securities Dealers, Inc. ("NASD), and held

himself out to the public in general and, in particular, to the Trusts, as a professional

knowledgeable and sophisticated in investments and financial and investment advice.

      182.    As a professional in the field of rendering financial and investment advice, Pope

owed to the Trusts a fiduciary duty including a duty and standard of care of:

      a.    A knowledgeable and sophisticated individual in the field of financial and

investment advice; and

      b.    Pursuant to rules and regulations of FINRA and its predecessor, the NASD, a

duty to "know your customer" meaning to know and understand the customer's risk tolerance,

70

time horizon, investment knowledge, investment experience, income needs, liquidity needs, and any other matter important and/or significant to the recommendation or giving of financial and investment advice.

183.   Pope breached this fiduciary duty and duty of professional care and the duty to "know your customer" in the following respects:

a.   Pope failed to advise diversification, instead, concentrating the assets of the Trusts in high risk, illiquid, private direct participation program investments, all of which were concentrated in oil and gas, and all of which proved to be fraudulent Ponzi schemes;

b.   Knowingly offering and selling to the Talmage Trust the Series B Debentures only suitable for accredited investors, with knowledge that the Talmage Trust was not an accredited investor;

c.   Knowingly offering and selling to the Trusts investments that were unsuitable in view of the Trusts' and their sole beneficiary's risk tolerance, investment objectives, time horizons, investment experience, investment knowledge, liquidity needs, medical condition and mental capabilities of Martha W. Gibbs, the Trusts' sole beneficiary; and

d.   The failure to do a Due Diligence Investigation, including failing to recognize the significance of the lack of audited financial statements in all of the investments sold by Pope to the Trusts, the result being the sale of fraudulent Ponzi scheme investments to the Trusts.

184.   As a direct and proximate result of the professional negligence of Pope, the Trusts have sustained a loss upon the DPP Investments described herein together with costs and attorney's fees incurred herein in recovering such investment losses.

## ELEVENTH CLAIM FOR RELIEF
### (Fraud)

185.    Paragraphs 1 through 184 of the Complaint are re-alleged and incorporated by reference herein.

186.    As set forth herein, the Defendants, including Lawrence, directly and/or indirectly participated in a fraud, and/or aided and abetted in a fraud, consisting of the making of untrue statements of material facts, and the failure to disclose material facts to the Trusts, and otherwise engaged in acts, practices, and courses of dealings which operated as a fraud upon the Trusts, in the offer and sale of the DPP Investments described herein to the Trusts.

187.    In purchasing the DPP Investments described herein, the Trusts relied upon the verbal representations made to them by the Defendants, including Lawrence, the written representations made in the private placement memoranda and other offering materials provided to them, the completeness of the verbal and written statements made to them, and the legitimate appearance that the private placement memoranda and offering documents presented. Such reliance was justified.

188.    As a direct and proximate result of the fraud of the Defendants, including Lawrence, including their aiding and abetting through the control of those directly participating in the fraud and through the material assistance provided to those participating in the fraud, the Trusts have suffered loss upon the DPP Investments, together with costs and attorney's fees incurred herein in recovering such amount.

## TWELTH CLAIM FOR RELIEF
### (Civil Conspiracy)

189.    Paragraphs 1 through 188 of this Complaint are re-alleged and incorporated by

reference herein.

190.    Lawrence, Pope, and CapWest entered into an agreement and/or understanding, the purpose of which was to offer and sell to the Trusts, and numerous other residents of the State of Wyoming, high risk unregistered securities consisting of DPP Investments and other securities, both registered and unregistered.

191.    In order to accomplish the above-said purpose and objective of offering and selling high risk unregistered securities to the Trusts and others within the State of Wyoming, Lawrence, Pope, and CapWest engaged in numerous meetings and discussions, the exact dates of which are presently unknown but upon information and belief are alleged to have occurred between on or about approximately July of 2006 through on or about September of 2008.

192.    Lawrence, Pope, and CapWest agreed to accomplish the above-said purpose and objective through agreements, including but not limited to:

a.  Lawrence and Pope jointly recommending to the Trusts and others the purchase of the DPP Investments made by the Trusts and others;

b.  Distributing private placement memoranda and other offering documents of the DPP Investments to the Trusts and others; and

c.  Offering and selling to the Trusts and others the DPP Investments described herein.

193.    In offering and selling to the Trusts the DPP Investments as described herein, Lawrence, Pope, and CapWest committed unlawful overt acts as alleged herein, including but not limited to violation of federal and state securities laws as alleged herein.

194.    Direct Capital and CapWest entered into an agreement and/or understanding, the purpose of which was to offer and sell to the Talmage Trust and numerous other residents of the State of Wyoming and other states, the Striker Series B Debentures.

195.    In order to accomplish the above-said purpose and objectives of offering and selling Striker Series B Debentures to the Talmage Trust and others, Direct Capital, through its representatives, who are currently unknown to the Plaintiffs, and CapWest, through its representatives, who are also currently unknown to the Plaintiffs, engaged in numerous meetings and discussions, the exact dates of which are presently unknown but upon information and belief are alleged to have occurred on or about approximately July of 2006 through at least September of 2007.

196.    Direct Capital and CapWest agreed to accomplish the above-said purpose and objectives through agreements, including but not limited to:

a.    CapWest serving as a member of the "selling group" and, as a member of the selling group, recommending and selling to the Talmage Trust and others, the Striker Series B Debentures;

b.    CapWest, as a member of the selling group, distributing private placement memoranda and other offering documents to the Talmage Trust and others; and

c.    The offering and selling to the Talmage Trust and others of the Striker Series B Debentures as described herein.

197.    In offering and selling to the Talmage Trust the Striker Series B Debentures as described herein, Direct Capital and CapWest committed unlawful overt acts as alleged herein, including but not limited to violation of federal and state securities laws as alleged herein.

74

198.    As a direct and proximate result of the unlawful civil conspiracies engaged in by Lawrence, Pope, and CapWest, and by Direct Capital and CapWest, the Trusts have suffered a loss upon the DPP Investments, together with costs and attorney's fees incurred herein in recovering such amount.

## THIRTEENTH CLAIM FOR RELIEF
### (Negligence)

199.    Paragraphs 1 through 198 of this Complaint are re-alleged and incorporated by reference herein.

200.    Through the acts and omissions described herein, the Defendants Lawrence, Pope, Direct Capital (Series B Debentures only), Womack (Series B Debentures only), CapWest, Holmes, Hancock (Series B Debentures only) and Secore & Waller (SR-12 only) offered and/or sold, directly or indirectly, aided and abetted in the sale, and/or directly or indirectly controlled, thus aiding and abetting others, in the sale of the DPP Investments described herein to the Trusts.

201.    Each of the Defendants Lawrence, Pope, Direct Capital (Series B Debentures only), Womack (Series B Debentures only), CapWest, Holmes, Hancock (Series B Debentures only) and Secore & Waller (SR-12 only) owed a duty to the Trusts as described herein.

202.    Each of the Defendants Lawrence, Pope, Direct Capital (Series B Debentures only), Womack (Series B Debentures only), CapWest, Holmes, Hancock (Series B Debentures only) and Secore & Waller (SR-12 only) breached the duty each owed to the Trusts through the acts and omissions described herein.  As a direct and proximate result of the Defendants' breaches of the duties each owed to the Trusts, the Trusts have suffered a loss upon the DPP Investments described herein, together with costs and attorney's fees incurred herein in

75

recovering such losses.

## **FOURTEENTH CLAIM FOR RELIEF**
### **(Breach of Fiduciary Duty – Holmes)**

203.    Paragraphs 1 through 202 of this Complaint are re-alleged and incorporated by reference herein.

204.    Holmes served as the trustee for the Striker Debenture holders, and pursuant to representations contained in the private placement memorandum for the Striker Series B and Series B-4 Debentures, was purportedly an "independent third party trustee" for the purchasers of the Series B and Series B-4 Debentures. As a trustee for the Debenture holders of the Series B and Series B-4 Striker Debentures, including the Trusts, Holmes occupied a position of trust and confidence and as a trustee was a fiduciary as to the Trusts.

205.    As the trustee for the benefit of the Trusts, Holmes owed the Trusts a fiduciary duty of honesty, good faith, fair dealing, and fulfillment of his duties as trustee in an honest and good faith manor for the benefit of the Trusts.

206.    Holmes breached the fiduciary duty which he owed the Trusts in ways described herein including the following:

a. In accordance with the representations contained in the private placement memorandum for the Series B and Series B-4 Striker Debentures, failing to be "independent." Holmes was never "independent" as at all times relevant to the allegations of this Complaint he was an officer of Striker, the general counsel of Striker, and/or outside legal counsel to Striker, and in all such capacities, either directly employed by or serving at the pleasure of Striker, the issuer of the Debentures;

b. Being a "third party" as to Striker. Holmes was never a "third party" as to

Striker. At all times relevant to the allegations of this Complaint as he was either an officer of Striker, the general counsel of Striker, and/or outside legal counsel and either directly employed by or serving at the pleasure of Striker;

   c. Failing to disclose to the Trusts that as Trustee for the Trusts and other Debenture holders of the Series B and Series B-4 Striker Debentures, that he was neither "independent" nor a "third party;"

   d. Failing to disclose to the Trusts and other holders of the Series B and Series B-4 Striker Debentures, that Striker was operating a fraudulent Ponzi scheme as has been described in this Complaint;

   e. Failing to fulfill his duties as trustee for the benefit of the Trusts and other Series B and Series B-4 Striker Debenture holders by, among other things, failing to foreclose and/or take possession of the collateral for the benefit of the Trusts and other Series B and Series B-4 Striker Debenture holders; and

   f. Failing to disclose to the Trusts and other holders of Series B and Series B-4 Striker Debentures that the collateral was not as represented in the private placement memorandum, and was not sufficient to secure the Debentures.

   207. As a direct and proximate result of the breach of fiduciary duty of Holmes, the Trusts have suffered a loss upon the Series B and Series B-4 Striker Debentures which they purchased, together with costs and attorney's fees incurred herein in recovering such amounts.

## FIFTEENTH CLAIM FOR RELIEF
### (Vicarious Liability and *Respondeat Superior*)

   208. Paragraphs 1 through 207 of this Complaint are re-alleged and incorporated by reference herein.

209. Pope was an employee and/or otherwise controlled pursuant to agreement or other arrangement by CapWest.

210. Pope was a registered representative, registered pursuant to FINRA and/or its predecessor, the NASD, of CapWest.

211. Under principles of vicarious liability and/or *respondeat superior*, CapWest is liable for the acts and conduct of Pope as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, the Alida D. Talmage Trust FBO Martha Gibbs, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustee, and the Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees, respectfully request the following:

A. An award of damages against Dennis R. Lawrence, Randall Pope, Professional Money Management, LLC, CapWest Securities, Inc., Capstone Financial Group, Inc., Colorado Capital Holdings, LLC, and Dale Keith Hall in the amount of $762,000, or such other amount as may be established at trial.

B. An award of damages against Direct Capital Securities, Inc., TIC Capital Markets, Inc., Clay Harriss Womack, Pacific Security Income Partners LP, Pacific Security Group, Inc, Richard Hancock, and Debra Harrawood White in the amount of $492,000, or such other amount as may be established at trial.

C. An award of damages against Steve Holmes in the amount of $627,000 or such other amount as may be established at trial.

D. An award of damages against Secore & Waller, LLP in the amount of $135,000, or such other amount as may be established at trial.

E.    Costs incurred herein.

F.    Attorney's fees as provided by law.

G.    Any other relief deemed just and proper under the circumstances.

DATED this 4th day of August, 2010.

DAVIS & CANNON, LLP

By: _____
J. Mark Stewart
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Phone: (307) 634-3210
Facsimile: (307) 778-7118
mark@davisandcannonchey.com


Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
Sheridan, WY 82801
Phone: (307) 672-7491
Facsimile: (307) 672-8955
cannon@davisandcannon.com

John A. Hutchings (*pro hac vice* pending)
DILL DILL CARR STONEBRAKER
  & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: (303) 777-3737
Facsimile: (303) 777-3823
jhutchings@dillanddill.com

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by Jury.

DATED this 4ᵗʰ day of August, 2010.

DAVIS & CANNON, LLP

By: _____

J. Mark Stewart
422 West 26ᵗʰ Street
P.O. Box 43
Cheyenne, WY 82003
Phone: (307) 634-3210
Facsimile: (307) 778-7118
mark@davisandcannonchey.com

Kim D. Cannon
DAVIS & CANNON, LLP
40 South Main
Sheridan, WY 82801
Phone: (307) 672-7491
Facsimile: (307) 672-8955
cannon@davisandcannon.com

John A. Hutchings (*pro hac vice* pending)
DILL DILL CARR STONEBRAKER
   & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, CO 80203
Phone: (303) 777-3737
Facsimile: (303) 777-3823
jhutchings@dillanddill.com

## CERTIFICATE OF SERVICE

I, J. Mark Stewart, certify that on the 5th day of August, 2010, a copy of the foregoing was served by the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following:

Jeffrey C. Brinkerhoff
Mark W. Gifford
Gifford & Brinkerhoff
jeff@giffordbrinkerhoff.com
mark@giffordbrinkerhoff.com

David A. Baugh
Baugh Dalton Carlson & Ryan, LLC
dbaugh@baughdaltonlaw.com

Michael T. McConnell
Traci VanPelt
Jared Lockwood
McConnell Fleischner Houghtaling & Craigmile, LLC
mmcconnell@mfhc.com
tvanpelt@mfhc.com
jlockwood@mfhc.com

And served via United States mail to the following:

Rick L. Koehmstedt
Schwartz, Bon, Walker & Studer, LLC
141 South Center, Suite 500
Casper, WY 82601

Thomas N. Fitzgibbon
Kimberly Thigpen
Pfeiffer, Thigpen, Fitzgibbon & Ziontz, LLP
233 Wilshire Blvd., Suite 220
Santa Monica, CA 90401

Jason Tangeman
Nicholas & Tangeman, LLC
170 North Fifth Street
P.O. Box 929
Laramie, WY 82072

Charles Gameros, Jr.
Hoge & Gameros, LLP
4514 Cole Avenue, Suite 1500
Dallas, TX  75205

K. Lawson Pedigo
Miller, Keffer, Bullock & Pedigo
8401 North Central Expressway, Suite 630
Dallas, TX  75225

Thomas N. Long
Laura Jean Jackson
Long, Reimer, Winegar, Beppler, LLP
2120 Carey Avenue, Suite 300
Cheyenne, WY  82001

David F. DeFazio
DeFazio Law Office, LLC
172 Center Street, Suite 203
P.O. Box 4877
Jackson, WY  83001

Amir Tadjedin
Markun Zusman & Compton LLP
811 SW Naito Parkway, Suite 420
Portland, OR  97204

J. Mark Stewart