Rick L. Koehmstedt
**SCHWARTZ, BON, WALKER & STUDER, LLC**
141 S. Center, Suite 500
Casper, WY  82601
Tel: (307) 235-6681
Fax: (307) 234-5099
E-mail: rick@schwartzbon.com

Thomas N. FitzGibbon (*Admitted Pro Hac Vice*)
Kimberly L. Thigpen (*Admitted Pro Hac Vice*)
**PFEIFFER THIGPEN FITZGIBBON & ZIONTZ LLP**
233 Wilshire Boulevard, Suite 220
Santa Monica, California 90401
Tel: (310) 451-5800
Fax: (310) 496-3175
E-mail: tnf@ptflaw.com
E-mail: klt@ptflaw.com

Attorneys for Defendants
*TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*
*Clay Womack, Pacific Security Income Partners LP*
*and Pacific Security Group, Inc*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| THE MARTHA W. GIBBS REVOCABLE TRUST, SUSAN GIBBS, SCOTT M. GIBBS, AND JAMES W. GIBBS, TRUSTEES; et al. | CASE NO.: 10-CV-0120-D |
| Plaintiffs, | |
| v. | |
| DENNIS R. LAWRENCE; et al. | |
| Defendants. | |

---

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM FOR RELIEF PURSUANT TO FED. R. CIV. P. 12(b)(6) OF DEFENDANTS DIRECT CAPITAL SECURITIES, INC., TIC CAPITAL MARKETS, INC., CLAY WOMACK, PACIFIC SECURITY INCOME PARTNERS LP AND PACIFIC SECURITY GROUP, INC.**

Defendants Direct Capital Securities, Inc. ("**DCS**"), TIC Capital Markets, Inc. ("**TICCM**"), Clay Womack ("**Womack**"), Pacific Security Income Partners LP ("**PSIP**") and Pacific Security Group, Inc. ("**PSG**") (collectively the "**Broker Defendants**") by and through their attorneys submit this Memorandum in support of their motion to dismiss claims one, two, six, eleven, twelve and thirteen of the First Amended Complaint ("**Complaint**") of Plaintiffs The Martha W. Gibbs Revocable Trust, Susan Gibbs, Scott M. Gibbs, and James W. Gibbs, Trustees (the "**Gibbs Trust**"); and Alida D. Talmage Trust FBO Martha Gibbs, Susan Gibbs, Scott M. Gibbs, Trustees (the "**Talmage Trust**") (collectively "**Gibbs**" or "**Plaintiffs**") for failure to state a claim upon which relief can be granted pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. [1]/ The Broker Defendants also respectfully request that the Court decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over any state law claims alleged against them that are not dismissed.

## I.   <u>INTRODUCTION.</u>

Although Plaintiffs' Complaint looks like the others in these consolidated cases before the Court, as to the Broker Defendants it is very different because (1) none of the Plaintiffs was actually a purchaser of any securities associated with DCS, namely the Series B debentures (the "**Series B Debenture**s") offered by Striker Petroleum, LLC, and (2) no person associated with the purchase of the Series B Debentures alleges they received, let alone read or relied on the Private Placement Memorandum ("**PPM**") for such offering. Accordingly, no claims of any kind are stated as against the Broker Defendants by Plaintiffs because (1) there was no purchase of a security by any Plaintiff and therefore they lack standing, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749, 95 S. Ct. 1917 (1975)(holding that only "a purchaser or seller of

---

[1]/     The first step in assessing any claims against the Broker Defendants is to determine whether personal jurisdiction exists pursuant under Rule 12(b)(2) and governing Tenth Circuit authority, *Peay v. BellSouth Medical Assistance Plan,* 205 F.3d 1206 (10th Cir. 2000). Under *Peay,* this Court lacks personal jurisdiction over TICCM, PSG and PSIP. That issue is being addressed separately by those Defendants in their Motion to Dismiss under Rule 12(b)(2) for lack of personal jurisdiction. Without consenting to this Court's personal jurisdiction over them, and subject to its jurisdictional motion, those three Defendants join with Womack and DCS and move to dismiss all claims against them under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

securities has standing to bring an action under Section 10(b) and Rule 10b-5"), and (2) there was no actual reliance or transaction causation. *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996).

The Complaint generally alleges that both Trusts bought various investment securities due to the fraud and improper conduct of Defendant Lawrence and that the two Trusts suffered a loss as a result. DCS is only alleged to be involved in one of the investments, the Series B Debentures allegedly bought by the Talmage Trust. Although the Complaint makes the conclusory allegation that the Talmage Trust purchased these Series B Debentures, (Compl. ¶ 34), the actual facts alleged make it clear that the Talmage Trust was NOT the purchaser and that it was an entity known as Indian Plains, LLC, which is not a party to the case. (Compl. ¶¶ 4, 44, 55) The Complaint alleges that Defendant Lawrence was the trustee for the Talmage Trust and that he made the investment decision based on phone calls with executives at Striker (Steve Holmes) and with Mr. Pope, (Compl. ¶¶ 50-53), as well his own knowledge. There are no facts alleged that he actually read or relied on the Series B PPM,[2]/ let alone the fact that DCS disseminated it, which reliance would be inconsistent with Plaintiffs' allegations in all these cases that Lawrence was a wrongdoer who knew that the Striker offerings were fraudulent. Further, John Gibbs signed the subscription documents for the purchase by Indian Plains, LLC and there is no allegation that he read or reviewed the Series B PPM, even though the Complaint makes the unsupported conclusion that the Indian Plains purchase was "based on" the PPM. (Compl. ¶ 61) In short, all the claims against the Broker Defendants in this case are based on one purchase of debentures (a) by an limited liability company that is a stranger to the case, and (b) in which DCS was not actually alleged to be involved or associated in any way. Thus, no claims have been stated, whether for securities fraud or otherwise.

Assuming there were a proper plaintiff and that such plaintiff actually read and relied on the Series B PPM disseminated (but not authored) by DCS, there is still no claim for securities fraud stated. The substance of the Complaint as against DCS is the allegation that it was

---

[2]/   The Complaint alleges that one of the Gibbs children, Susan Gibbs, who had no investment authority and was not alleged to be involved with any purchase of any security, had a copy of the PPM for Striker Series A Debentures. (Compl. ¶ 50(b))

responsible for alleged misrepresentations and material omissions in the Series B Private Placement Memorandum prepared by Striker because it allegedly did insufficient due diligence—and that had it done sufficient due diligence it would have uncovered the alleged Ponzi scheme and that the Talmage Trust would not then have made the investment into Indian Plains which would not have purchased the Striker Debentures.  (Compl. ¶ 84.) The sufficiency of these allegations under Section 10(b) and Rule 10b-5 are challenged in detail in the Motion to Dismiss by the Broker Defendants with respect to the Fieldgrove Complaint and that argument will be incorporated by reference in the Memorandum supporting this Motion.  In particular, the facts alleged do not show a strong inference of scienter on the part of DCS because (1) it applies an improper hindsight standard, (2) it seeks to demonstrate scienter though an inability to predict future malfeasance, (3) wrongly suggests that DCS needed to audit the financial statements of Striker, and (4) does not show corporate scienter because no facts show that a person acted with scienter.  Further, there is no loss causation alleged.

As to the control person claims under Section 20(a) of the Exchange Act alleged in Claim Two, they fail because (a) there is not a primary violation alleged against DCS, and (b) there are insufficient facts alleged to show control by any of the purported control defendants.

The result must be the same for the state law claims in Claims Eleven, Twelve and Thirteen because (1) there is no proper plaintiff and (2) if reliance on the PPM was not alleged to cause Lawrence and/or John Gibbs to make the investment into the Series B Debentures for Indian Plains, there is no causal link to any damage regarding the fraud, negligence or conspiracy claims (assuming such a claim for relief even exists). Likewise for Claim Six under the Texas securities laws because there is no claim available to non-purchaser, there is no allegation that DCS made any materially false statements, and there is an insufficient nexus to Texas alleged.

II.   **FACTUAL BACKGROUND.**

    A.   **The Allegations of the Complaint.**

       *1.*   *The Allegations About The Plaintiffs.*

Although the Complaint is filled with factual information about the age and medical conditions of Martha Gibbs, it is not relevant to the Complaint because she was not a purchaser of securities and has no claims against DCS.  (Compl. ¶¶ 3, 6, 49)  The current trustees of the Talmage Trust, Susan Gibbs, Scott M. Gibbs and James W. Gibbs are not alleged to have been

trustees at the time of the Indian Plains purchase, so their knowledge—or lack thereof--cannot be used to state a claim for securities fraud on behalf of the Trust.  (Compl. ¶ 2)  James W. Gibbs, a member of Indian Plains, did sign the subscription agreement for Indian Plains, but never alleged to have received, read or relied on the PPM. (Compl. ¶ 61)

At the time of the purchase by Indian Plains, Lawrence was the trustee for the Talmage Trust. (Compl. ¶¶ 1, 3, 14, 44)  Lawrence is not alleged to have read or actually relied on the PPM, instead there is the allegation that he "gave to other persons" the PPM and the conclusory allegation that "was aware of the information" in it. (Compl. ¶¶ 56-57)

　　　　2.　　*The Series B Offering And The Allegedly Insufficient Due Diligence by DCS.*

DCS is alleged (a) to have been involved in the Striker Series B Debenture Offering as the managing-broker dealer, and (b) to have received a due diligence payment of 2% of the gross proceeds.  (Compl. ¶ 78)  This allegation is not accurate as the Complaint mischaracterizes the due diligence allocation because the PPM does not actually state that DCS was to perform due diligence or actually be paid the 2% of gross proceeds, only that it would receive a marketing and due diligence allowance in that amount, which could be reallowed to the selling brokers.[3]/

The Complaint does not allege that DCS drafted the PPM or any of the statements in it, instead only that it "disseminated" the document. (Compl. ¶ 86) Similarly, it is not alleged that any of the allegedly fraudulent statements in the PPM, e.g. statements about the trustee or the financial statements, were in any way attributed to DCS.  The PPM also demonstrates that no such statements were made by or attributable to DCS. (Docket #94-4 & 94-5) Thus, even though DCS did not prepare the PPMs, Plaintiffs still seek to hold DCS responsible for the claimed misrepresentations and/or omissions in the two PPMs.  (Compl. ¶¶ 87-88)

Instead, the gravamen of the Complaint against DCS is Plaintiffs' contention that it should have performed better due diligence, particularly with respect to the unaudited financial

---

[3]/　　　The only reference to due diligence in the Series B PPM is as follows: "Direct Capital Securities will receive a non-accountable marketing and due diligence allowance in the amount of 2% of the Gross Proceeds, which it may re-allow to other members of the Selling Group on a non-accountable basis." (Docket #94-4, Exhibit B, Pages 3 & 18)

statements of Striker in the PPM. (Compl. ¶¶ 78-88)   For example: "Had Direct Capital performed a reasonable due diligence investigation…it would have discovered: a. that money used in prior offerings was not be utilized as represented but, instead, was being used to pay promised returns to investors in earlier offerings; b. That financial information and financial statements contained in prior offerings, as well as in the Series B and Series B-2 Debenture Offerings were false and inaccurate…." (Compl. ¶ 84) The theory goes that if DCS did better due diligence it would likely have discovered material mistakes in those unaudited financial statements, identified the source and basis for the mistakes, from which DCS could then have predicted that Striker would use the proceeds of the Offerings in the future for unapproved purposes, and given a warning to Plaintiffs.  (Compl. ¶ 107)

The Complaint alleges the PPMs contained six misrepresentations and three material omissions:

| Allegation | Status & Time |
|---|---|
| Proceeds "would be used to purchase oil & gas properties." (Compl. ¶ 57(a)) | Misrepresentation re future act |
| Proceeds "would be utilized primarily for the purchase of oil & gas properties..." (Compl. ¶ 57(b)) | Misrepresentation re future act |
| "That the Series B Debentures would be collateralized by oil and gas properties purchased with the proceeds…" (Compl. ¶ 61(c)) | Misrepresentation re future act |
| "That there would be appointed and independent third-party trustee for the Series B Debentures…" (Compl. ¶ 61(d)) | Misrepresentation re future act |
| "That the assets of Striker were as represented in the unaudited financial statements…" (Compl. ¶ 61(e)) | Misrepresentation re existing fact |
| "That the revenue of Striker was as represented in the unaudited financial statements…" (Compl. ¶ 61(f)) | Misrepresentation re existing fact |
| The PPM omitted to disclose the "risks of the lack of audited financial statements…" (Compl. ¶ 58(a)) | Omission of generalized investment warning that might have revealed Ponzi scheme |
| That "the purported trustee for the debentures purchased by the Fieldgroves" was not independent. (Compl. ¶ 58(b)) | Omission as to existing and future status |
| "That although Striker purported to have positive operating revenues, it was, in fact, operating at a loss." (Compl. ¶ 58(c)) | Omission as to existing fact |

(*See also* Compl. ¶¶ 84, 88) The last two "omissions" are really contending that the representations in the PPM were inaccurate and that such falsity was concealed—thus these are not true omissions.

Knowing that these facts are not sufficient to show scienter, Plaintiffs identify four prior Striker offerings to suggest that the involvement of DCS in those offerings made their participation in the Series B Debentures reckless.  (Compl. ¶¶ 79-83) They allege that this prior involvement gave DCS "ample opportunity to investigate" the results of the prior offerings. (Compl. ¶ 82)  This suggestion that the fraud should have been discovered is contradicted by the allegations Paragraph 155 in which it is alleged there were no indications of Ponzi scheme until December 2009.  (Compl. ¶ 155) Further, the Complaint only alleges that "one or more" of these four earlier offerings was a part of the Ponzi scheme, which means that even if true, the others were not and would in any way show scienter. (Compl. ¶ 80) The key contention of Plaintiffs about the prior offerings is that a "reasonable due diligence investigation would include a detailed examination of the financial statements of Striker and its affiliates with a particular emphasis on historical use of proceeds and the accuracy and reliability of financial information previously provided." (Compl. ¶ 82) What this argues, in hindsight, is that Plaintiffs contend that DCS should have done an audit, even though the financial statements clearly advised investors they were not audited.

Paragraph 85 is an "alternative" pleading which simply speculates that "Direct Capital did discover though a due diligence investigation" that the statements in the PPM were false. (Compl. ¶ 85)  This conclusory paragraph is entitled to no weight under *Iqbal*.  Paragraphs 87 and 88 allege in conclusory fashion that DCS owed a duty to Plaintiffs to conduct a due diligence investigation and that they breached this duty. (Compl. ¶¶ 87-88)  Paragraphs 89 and 90 allege that DCS owed a duty to Plaintiffs to supervise all those selling the Debentures, including CapWest and that they breached this duty. (Compl. ¶¶ 89-90)  This lack of supervision allegation is contradicted by the Subscription Booklet (including the Investor Questionnaire) in the PPM which shows that meaningful procedures were in place to require all purchasers to be accredited and to confirm that purchasers were not supposed to rely on anything other than the PPM in purchasing the Debentures. (Docket #94-4, page 35-37, #94-5, pages 1-16)

### 3.    *The Allegations Regarding Standing And Reliance.*

The Plaintiffs have not alleged facts to show they have standing to bring these claims because, even though there are legal conclusions asserted to the contrary, (Compl. ¶¶ 45, 59), the facts actually alleged in the Complaint make it clear that the Talmage Trust was not the

purchaser of the challenged Debentures (*e.g.* "Lawrence and Pope structured the Talmage Trust's purchase of the Striker Series B Debentures *through* Indian Plains…") (Compl. ¶¶ 4, 44)

The Complaint tries to allege reliance, such as in Paragraph 73, as it states that the "Talmage Trust relied upon the recommendations and statements of Lawrence […] and the representations and truthfulness and accuracy of the statements contained in the Confidential Private Placement Memorandum of the Striker Series B … Debentures…" (Compl. ¶ 73.) There is similar boilerplate stating that "in reliance upon the completeness and accuracy of such representations and the disclosures contained in such documents…" that the Trust made the investments. (Compl. ¶ 77) These are not facts, they are legal conclusions (which are not presumed true under *Iqbal)* and a fiction, because *a trust must act through a person*, and here it was the trustee Lawrence, the key defendant who caused the Indian Plains purchase through which the Talmage Trust makes it claim.

Assuming Trust were actually the purchaser, the only plausible reliance could be that of would be that of Lawrence, the trustee.[4]/ The Complaint does not allege facts showing actual reliance by Lawrence upon the PPM because the three Complaints by the Miles, Gibbs and Fieldgrove Plaintiffs allege over and over that Lawrence and Pope conspired to defraud the investors by concealing their inside knowledge of Striker (*see e.g.* that the Debenture offerings were actually Pope's idea and that they had inside knowledge from meetings and communications with Striker principals)(Compl. ¶¶ 32, 50-53) and that they profited by recommending that investors buy these securities when they knew they were not appropriate investments for the investors. (Compl. ¶¶ 108-110) The Complaint does not allege that Lawrence read the Series B PPM, nor that he reasonably relied upon it. Paragraphs 56 and 57 are the key paragraphs which state only that the purchase was "based on" the PPM because Lawrence was "aware" of the PPM, not that he read it or relied on it. (Compl. ¶¶ 56-57) These are mere legal conclusions and must be disregarded in accordance with *Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1949-50 (2009).

---

[4]/     Although it is alleged that James W. Gibbs, as member of Indian Plains, signed the subscription agreement, there are no facts alleged to support the conclusion that such purchase was for the Trust or that he was authorized to act for it. Even if were he authorized to act, he was never alleged to have received, read or relied on the PPM. (Compl. ¶ 61)

4.      *The First Claim for Relief – Securities Fraud.*

The First Claim for Relief under Section 10(b) and Rule 10b-5 repeats the above allegations and adds several legal conclusions to try to meet the elements of a claim for securities fraud. (Compl. ¶¶ 103-16) No new facts are alleged in the body of the Claim. The crucial reliance allegation is a vague legal conclusion and does not identify DCS or any Broker Defendant, but only the generic "Defendants" and then concludes that reliance was justified by the Trust, rather than a person as required: "The Trusts relied upon the representations of the Defendants including the representations contained in the written documents and materials provided to the Trusts in the purchase of the DPP Investments. Such reliance was justified." (Compl. ¶ 114) The operative paragraphs seeking to impose liability under Rule 10b-5 are 107 (claiming a scheme), 108 (claiming affirmative misrepresentations), 109 (material omissions from the affirmative representations), and 110 (claiming a course of business that was a fraud or deceit). These allegations are boilerplate recitations of the elements of a claim for securities fraud and repetition of "facts" alleged earlier as a part of an attempt to improperly impose liability upon DCS.

5.      *The Allegations Against the Corporate Control Defendants- Claims Two, Six & Eleven.*

Defendants TICCM, PSIP and PSG are referred to as the "**Corporate Control Defendants**" and with Womack they are referred to as the "**Control Defendants**." None of the Corporate Control Defendants is alleged to have been involved in any way with either Offering, as they are only alleged to have control person liability for the federal securities claims, (Compl. ¶¶ 120-21), the Texas securities claims (Compl. ¶¶ 151-53), and the Wyoming common-law fraud claims. (Compl. ¶¶ 185-88) There are no actual alleged facts for federal control person liability except that they were listed on the FINRA web site. (Compl. ¶¶ 22-23, 25) They are alleged to be Texas residents, although TICCM was not a Texas resident until well after the transactions. (Compl. ¶¶ 22-23, 25)

6.      *The Allegations Against Womack.*

Womack is a defendant in Claim Two, as a control person, Claim Six as a control person and aider and abettor, Claim Eleven for fraud and Claim Thirteen for negligence. Womack is alleged to be a Texas resident and an officer and director of DCS, as well as its securities principal. (Compl. ¶ 24) There are no facts alleged as to Womack's actual participation in the

Striker Series B Offering, or his mental state with respect to any actions on his part, such as a review of the Striker financial statements.  He is not alleged to have actually taken any actions on behalf of DCS as relate to Plaintiffs.  There are only boilerplate and conclusory allegations that he had (a) a duty to conduct due diligence, (Compl. ¶ 87), and (b) a duty to supervise CapWest (Compl. ¶ 89), and that he breached these two duties.  (Compl. ¶¶ 88, 90)  There is no basis given for why Womack, as an individual, would have these duties to Plaintiffs, other than perhaps based on his corporate status.  No other specific allegations are made against Womack. As explained below, these conclusory allegations are insufficient to state any claim against him.

       7.      *The Sixth  Claim for Relief – The Texas Securities Act.*

      As to the Texas securities claim, the allegations are basically legal conclusions and "threadbare" recitations of the elements of that cause of action.  (Compl. ¶¶ 147-57)  DCS is alleged to have sold the securities using "untrue statements of material fact" or omissions, but there are no actual facts to support this boilerplate. (Compl. ¶ 149)  The Complaint also alleges DCS acted "with intent to deceive or defraud, or with reckless disregard for the truth or the law, materially aided Striker" and should be liable with Striker. (Compl. ¶ 153)  This bare allegation, like the rest of the Complaint, does not identify the person(s) at DCS who had such intent or the facts that would show such intent exists. The claim then admits that Plaintiffs were paid monthly as promised until January 2009, and that the matter was not reasonably discoverable as a fraud until that time. (Compl. ¶ 155)

       8.      *The Eleventh  Claim for Relief – Common Law Fraud Under Wyoming Law.*

      This claim is the most generic of all, despite the high pleading standard applicable to fraud. It asserts that: "Defendants directly and/or indirectly participated in a fraud, and/or aided and abetted in a fraud consisting of the making of untrue statements of material fact, and the failure to disclose material facts to the Trusts, and otherwise engaged in acts, practices, and courses of dealings which operated as a fraud upon the Trusts." (Compl. ¶ 186)  It also alleges in the next paragraph that Plaintiffs "relied upon […] the legitimate appearance that the private placement memoranda and offering documents presented."  (Compl. ¶ 187) These allegations, against all the Defendants no less, are so generalized they could apply to any investment fraud and insufficient to state a claim, whether against DCS or the Control Defendants.

9.    *The Twelfth Claim for Relief – Civil Conspiracy.*

This claim does not state which law applies, but there is no claim for civil conspiracy under Wyoming law or federal law.  The conclusory allegations are that DCS and CapWest agreed to sell the Striker Debentures and that they had unspecified meetings and discussions to accomplish the sale. (Compl. ¶¶ 194-96) The claim then states that unlawful acts were committed in the sale of the debentures, and therefore they were overt acts. (Compl. ¶ 197) It does not state that there was ever an unlawful agreement, or that either party knew the sale of the Debentures was not lawful, or that any of the alleged "overt acts" were taken in furtherance of the claimed conspiracy. There are no facts actually alleged about the persons involved, what was said, when it was said or whether any documents exist that might support the existence of the alleged conspiracy.

10.    *The Thirteenth Claim for Relief – Negligence Under Wyoming Law.*

This generic claim states that a great many of the Defendants, including DCS and Womack, owed an unspecified "duty" to the Fieldgroves and that they breached it through the allegations made elsewhere.  (Compl. ¶ 201-02)  The only actual allegations of a duty are in Paragraphs 87 and 89, and as explained above there are no facts to show (a) why in the absence of a securities purchase by the Trust any Defendant would have a duty to the Trust, (b) assuming there was a purchase why Womack would have such duty to the Trust as an individual, and (c) how either Womack or DCS might have breached such duties.

## III.    **LEGAL ARGUMENT**.

### A.    **The Court Should Dismiss The Federal Securities Fraud Claim.**

1.    *The Legal Standard For A Motion to Dismiss & For Fraud.*

The requirements to state a claim for securities fraud are set forth in the Memorandum in support of the Motion to Dismiss the Fieldgrove First Amended Complaint and are incorporated here by reference.

2.    *No Claim For Securities Fraud Is Stated Because There Is No Purchase or Sale of a Security Involving DCS by Any Plaintiff.*

The law requires that a securities fraud claim be brought by the purchaser. If the plaintiff is not the purchaser, they lack standing.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749,

95 S. Ct. 1917 (1975); *Westinghouse Credit Corporation v. Bader & Duffy*, 627 F.2d 221, 222 (10th Cir. 1980).

Here the Complaint plainly alleges the fact that Indian Plains was the actual purchaser, therefore the Talmage Trust does not have standing to bring this claim. (Compl. ¶¶ 44, 55, 59, 61)  Even though it makes the legal conclusions that the Talmage Trust was the purchaser, the actual facts make it clear that Indian Plains was the purchaser and that the Talmage Trust lacks standing.

> 3.    *No Actual Reliance Upon Any Statement of DCS by Any Plaintiff Is Alleged, Therefore No Claim is Stated.*

Even if the Talmage Trust had standing, actual reliance is an essential element of Plaintiffs' claim in order to show transaction causation, but it is lacking here.  The law regarding reliance and transaction causation is generally set forth in the Fieldgrove Memorandum and incorporated here by reference.

DCS is not alleged to have made any representations to any person acting on behalf of the Talmage Trust, whether in the PPM or otherwise.  Thus, without a representation by DCS, there can be no reliance as a matter of law. *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996); *Pacific Inv. Management Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159-60 (2d Cir. 2010).

In addition, here none of the Plaintiffs claim they received, let alone read or actually relied upon, the Series B PPM that was associated with the Series B Debenture purchase. Instead, the purchase was made by Indian Plains, LLC and the documents were signed by John Gibbs. (Compl. ¶ 61)  He did not allege facts demonstrating receipt, review or actual reliance upon the Series B PPM, despite the conclusory allegation that Indian Plains made the investment "as a result of" the PPM, as well as the representations of Pope and Lawrence. (Compl. ¶ 61) Further, there are no facts alleged that John Gibbs was authorized to act on behalf of the Trust in making the investment through Indian Plains.

Thus, the only possible reliance could be that of Lawrence, but it is not alleged. The Complaint asserts that Indian Plains made the Striker Series B investment at the direction of Defendant Lawrence, who was the Trustee for the Talmage Trust. (Compl. ¶¶ 59-61)  There are no allegations, however, that Lawrence read or actually relied on the Series B PPM, and those

would be inconsistent with the repeated allegations in the various complaints before this Court, including this one, that Lawrence was a wrongdoer and was fully aware—through his associations with Pope---that the Striker offerings were fraudulent. (See Compl. ¶¶ 107-110) Certainly there are no facts alleged anywhere showing that Lawrence relied on the "dissemination" of the Series B PPM by DCS for any purpose, or that he was relying on DCS to perform due diligence. (Compl. ¶ 86) It is alleged generally only that Lawrence was a purchaser of Series B Debentures and that he "gave to other persons" a copy of the Series B PPM. (Compl. ¶ 56)  This does not allege that he relied on the PPM, nor is such conclusion consistent with the rest of the Complaint in which Lawrence was alleged to have arranged a call for the Gibbs children directly with the Chief Executive Officer of Striker. (Compl. ¶¶ 50-51)

Instead of facts there are boilerplate legal conclusions that the Talmage Trust—which is not an entity and must act through a person—relied on the Series B PPM.  (Compl. ¶¶ 56-57) These conclusions must be disregarded under *Iqbal*, especially where the true facts are alleged in the Complaint, that no person associated with the purchase relied on the offering documents, and particularly Lawrence who was the trustee at the time of the purchase.  (Compl. ¶¶ 1, 4, 44, 61)  *Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1949-50 (2009).  Because the facts show that there was no actual reliance by any person in connection with the Indian Plains purchase, there is no transaction causation and no claim for securities fraud stated.

### 4.   *No Scienter Is Alleged.*

For the same reasons set forth in the Fieldgrove Memorandum, the facts alleged in the Gibbs Complaint do not show that DCS acted with scienter (1) because the facts do not show a strong inference of reckless conduct that is the most plausible inference, and (2) because there is no concept of "corporate scienter" yet there are no allegations of scienter against any person. Thus, scienter is not adequately alleged under the PSLRA.

### 5.   *No Loss Causation Is Alleged.*

Loss causation requires a showing that the alleged misrepresentations or omissions caused the economic harm. *Huddleson v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981) *aff'd in part, rev'd in part by, Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983). If the particular loss complained of is caused by supervening general market forces or other factors unrelated to the defendant's misconduct that operate to reduce the value of the plaintiff's securities, the

plaintiff is precluded from recovery under Rule 10b-5." *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989). The PSLRA codified this judge-made requirement: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

Because there are no facts alleged to show that Plaintiffs actually relied on the PPM, there is no causal link between DCS's alleged misconduct and Plaintiffs' alleged loss. Further, the Complaint alleges that the loss occurred because of Striker's Ponzi scheme and the future diversion of payments. As against DCS, however, the allegation is only that it failed to do so sufficient due diligence—primarily by not detecting the mistakes in the financial statements or discovering that the trustee was not independent---to predict the future misuse of the proceeds. That is not enough of a link to show loss causation as it is too attenuated. Plaintiffs want DCS to act as an insurer against their loss, something clearly not contemplated or allowed by the securities laws.

**B.     There is No Control Person Liability In the Absence of Primary Liability and Because Plaintiffs Have Failed To Allege Facts Showing The Other Broker Defendants Were "Control Persons".**

The law provides that if there is no claim against an alleged primary violator, then control person liability claims also fail. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-5 (10th Cir. 1998); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108-9 (10th Cir. 2003). Here, because there are no viable federal claims against DCS, the boilerplate control person claims alleged in the Second Claim for Relief against the remaining Broker Defendants also fails to state a claim and should be dismissed.[5]/

To successfully state a prima facie case of control person liability within the meaning of Section 20(a), the plaintiff must make non-conclusory factual allegations sufficient to show (1) a primary violation of the securities laws and (2) "control or influence over the day-to-day operations" of the alleged primary violator. *Adams*, 340 F.3d at 1108; see *Maher*, 144 F.3d at

---

[5]/     This argument applies to the Fieldgrove Complaint and Defendants respectfully request that the Court consider in with respect to their Motion to Dismiss that Complaint as well.

1304-5. The Tenth Circuit has adopted the SEC's definition of "control," which requires Plaintiff to show "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *Maher*, 144 F.3d at 1305.

Here Plaintiffs must allege facts demonstrating that TICCM, Womack, PSG and PSIP "had actual power or influence over" DCS. *In Re Gupta Corp.*, 900 F. Supp. at 1243. Simply alleging ownership of the company or membership on the board of directors is not sufficient. *See Maher*, 144 F.3d at 1304-5 (10th Cir. 1998); *In Re Gupta Corp.*, 900 F. Supp. at 1243 (dismissing claim under 20(a) on the ground that allegations that defendant owned 8.7% of stock and controlled the contents of financial reports and press releases were conclusory and were insufficient to support allegations of control).

The allegations against Womack are that he was the Chairman and Chief Executive Officer of DCS, as well as its securities principal. (Compl. ¶ 24) There are no other facts alleged against him with respect to his control of DCS, or his involvement with the Striker offerings. There are boilerplate allegations that Womack had duties of due diligence and supervision and that he breached them, but no facts alleged in support of these conclusory allegations except based on his corporate status. (Compl. ¶¶ 87-90) Because corporate status allegations are not sufficient, no claim for relief has been stated against Womack as a control person.

The allegations against TICCM, PSIP and PSG are simply the conclusory allegations that they are listed as having control through FINRA. (Compl. ¶¶ 22-23, 25) There are no facts alleged whatsoever showing actual control or influence over DCS by any of the Broker Defendants, including those that have indirect interests in DCS. (*See* Compl. ¶¶22-23, 25, 151.) Further, there is no allegations about when they became control persons and whether they were control persons at the relevant times. Given this absence of facts about these control parties, no claim has been stated against them under Section 20(a).

## C. The Texas State Law Securities Fraud Claim Does Not State A Claim For Relief Against Any Defendant.

Plaintiffs allege claims for relief under the Texas Securities Act in Claim Three (Fieldgrove) and Claim Six (Gibbs). As to the Talmage Trust Claim alleging a violation of

the Texas Securities Act, it fails because Plaintiffs lacks standing to bring this claim. Even if the Trust had standing, it and the Fieldgrove Plaintiffs would not be able to state a claim for violation of the Texas Securities Act against the Broker Defendants because DCS made no representations to Plaintiffs, and because there is an insufficient connection to Texas with respect to the conduct of DCS.

To state a claim for violation of the Texas statute, Plaintiffs must show that either a Texas resident was injured by the fraudulent practices (which is not alleged here as Plaintiffs are Wyoming residents) or that non-Texas residents were injured from fraudulent securities practices emanating from Texas. *In re Enron Corp.,* 235 F. Supp. 2d 549, 692 (S.D. Tex. 2002). Certainly Striker's conduct was based in Texas, but at the time of the offering DCS was based in California and there are no facts alleged that DCS took any acts in Texas that affected Plaintiffs.[6]/   Accordingly, the statute does not appear apply to DCS, a non-Texas actor, in the first instance for non-Texas purchasers as this does not implicate the state of Texas and would result in due process concerns.  *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal. App. 4th 214, 225-26 (4th Dist. 1999)(refusing to permit adjudication of claims by out-of-state purchasers against out-of-state defendant); *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *but see Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 921-22 (Tex.Civ.App. 1976)(suggesting in dicta that non-Texas participants could be liable).

The statute provides:

> Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus

---

[6]/   DCS is now based in Texas, as alleged.

required in connection with a registration statement under 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security....

Tex.Rev.Civ. Stat. 581-33  Vernon's Supp. 2002).

To succeed on such claim, Plaintiffs must show that the alleged misrepresentation was material. *Granader v. McBee*, 23 F.3d 120, 123 (5th Cir. 1994). Here the alleged misrepresentations do not reach that standard, as the future actions by Striker could not have been predicted, and the trustee's alleged non-independence would not be significant enough to change the total mix of information. Although the financial statement errors appear at first glance to be material, there are not enough facts alleged to support that view. If the buyer still owns the securities at issue, rescission is the sole remedy available; only if he has sold the securities, may he obtain money damages. *Id.; Texas Capital Securities, Inc.*, 58 S.W.3d at 775.  Here, Plaintiffs do not allege the security was sold, so they have stated no claim for money damages, only potentially rescission, but as DCS was not the seller and did not receive the money from Plaintiffs, there is nothing for them to rescind. (Fieldgrove Compl. ¶ 131, Compl. ¶ 157)

Plaintiffs seeking to recover under the Texas statute cannot recover if they know of misstatement or omission upon which the claim of fraud is based. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1032 (5th Cir. 1990), *rehearing denied, overruled on other grounds*.  Here it is alleged that Lawrence caused the purchase for the Talmage Trust and further alleged that he knew of the claimed false statements in the PPM and relating to the Striker offering, therefore recovery is barred for the Talmage Trust, to the extent it can make a claim at all.

To make a prima facie case for control person liability under the Texas statute, the plaintiff must demonstrate that the defendant had actual power or influence over the controlled person and that the defendant induced or participated in the alleged violation. Texas Capital Securities, 80 S.W.3d at 261, *citing Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981). Status alone is insufficient to establish that a defendant is a control person within the ambit of the statute. *Id.* at 268, *citing Dennis*, 918 F.2d at 509.  The allegations against the Control Defendants simply do not suffice as they are only boilerplate and devoid of actual facts, as further explained above.  (Compl. ¶¶ 22-25, 151)

-16-

To establish aider and abettor liability under Art. 581-33(F)(2), a plaintiff must demonstrate (1) the existence of a primary violation of the securities laws, (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator. *Frank v. Bear, Stearns, & Co.*, 11 S.W.3d 380, 384 (Tex. App.-Houston [14th Dist.] 2000, *writ denied*). Like the control allegations, the allegations against the Control Defendants for aiding and abetting simply do not suffice as they are only boilerplate and devoid of actual facts.  (Compl. ¶¶ 22-25, 152-53)  This lack of facts particularly applies to the allegation that the Broker Defendants aided and abetted Striker, therefore this allegation cannot assist in stating a claim. (Fieldgrove Compl. ¶ 128, Compl. ¶ 153)

### D.     The Wyoming State Law Claims Do Not State Claims For Relief.

#### 1.     *Fraud Against the Broker Defendants is Not Alleged.*

Plaintiffs allege that all the Broker Defendants are liable for fraud in Claim Seven (Fieldgrove) and Claim Eleven (Gibbs).  Under Wyoming law, a plaintiff must establish three elements to state a claim for fraudulent misrepresentation: (1) by clear and convincing evidence that the defendant misrepresented a material fact, (2) that plaintiff relied upon the misrepresentations and that such reliance was reasonable, and (3) that plaintiff suffered injury as a result of reliance upon the misrepresentation.  *Richardson v. Hardin*, 5 P.3d 793, 797 (Wyo. 2000).  As the Court knows, fraud must be established by clear, unequivocal, and convincing evidence, and will never be presumed.  *Ahearn v. Anderson-Bishop Partnership*, 946 P.2d 417, 424 (Wyo. 1997).  Plaintiffs' enhanced burden of proof can be considered in evaluating a dispositive motion on a claim of fraud.  *McKenney v. Pacific First Federal Savings Bank*, 887 P.2d 927, 929 (1994) (*citing Laird v. Laird*, 597 P.2d 463 (Wyo. 1979)).

As with securities fraud, the Complaint lacks any facts to show that DCS made any representations at all to Plaintiffs.  The allegations are in Paragraphs 36-37, 57-58 and 108, which deal with statements made in the PPM, but as explained above, DCS is not alleged to have made such representations in the PPM, which were made by Striker.  Further, even if the statements in the PPM were attributed to DCS, the Complaint does not allege **facts** showing any reliance by Plaintiffs on those statements as they did not allege facts showing they read or relied on the

PPM, therefore a required element of the claim is missing. (Compl. ¶¶ 50, 54-56)   The boilerplate allegations of reliance must be disregarded in the face of facts showing there was none. (Compl. ¶¶ 73, 77)   As to DCS the primary allegation is that it failed to do sufficient due diligence. (Compl. ¶¶ 84, 86, 88.)   As a matter of law, such failure—if true—cannot constitute fraud but only negligence.

As to the required mental state, as explained above regarding the federal securities fraud claim, the Complaint does not allege that DCS was aware that any statements made were false or otherwise allege fraudulent intent.   Accordingly, no claim for state law fraud is pled.

Finally, it is well established in Wyoming that, as stated in *White v. Ogburn*, 528 P.2d 1167, 1171 (Wyo. 1974), plaintiffs can "not blind themselves to observe the readily available facts and place reliance upon such alleged misrepresentation without making a diligent inquiry of these facts."   Certainly Lawrence cannot meet this test in the Gibbs matter.   Assuming the Gibbs Plaintiffs or the Talmage Trust were considered purchasers, they, along with Plaintiffs in the Fieldgrove case, were told in the PPM, which based on the facts alleged they did not read, that the financial statements were not audited and they were warned about the risks of the investment.   Thus, any claim based on the fact that the financial statements were unaudited simply cannot survive.

As to the Control Defendants, including Womack, there are no facts of any kind alleged against them that show they made any representations, that Plaintiffs relied on them, or that such reliance caused damage there is no claim for fraud stated. (Compl. ¶¶ 22-25, 186)   Given the heightened pleading standard applicable to fraud, the fraud claims lack merit as a matter of law as to all Broker Defendants.

       2.    *Securities Fraud Cannot Be Alleged Through A Claim for Civil Conspiracy.*

The Twelfth Claim (Claim Eight in the Fieldgrove Complaint) alleges that DCS conspired with other defendants to commit violations of federal and state securities laws. (Compl. ¶¶ 194-97; Fieldgrove Compl., ¶¶ 160-163.)

The claims are Wyoming state law claims alleging that DCS "conspired" with CapWest to sell the Striker Debentures.   (Compl. ¶ 194; Fieldgrove Compl. ¶ 160)   It also alleges that they, through unknown agents, engaged in meetings and through agreements agreed to sell the Debentures. (Compl. ¶ 195-96; Fieldgrove Compl. ¶¶ 161-62)   There is no allegation in this

claim that this agreement had any unlawful objective or that either party knew there was anything improper about selling the Striker Debentures.  From these facts—which allege only that there was an agreement for CapWest to be a selling broker—the claim then makes the conclusory allegation that in selling the Debentures they committed overt acts in violation of federal securities laws.  (Compl. ¶ 197; Fieldgrove Compl. ¶163.)  This claim fails under either federal or state law.

> (a)     There is No Federal Claim for Conspiracy to Violate the Securities Laws.

As to federal law, Plaintiffs are trying to make an end run around the holding in *Central Bank* which abolished the group pleading doctrine, and conspiracy claims along with it.  *Central Bank, N.A. v. First Interstate Bank,* 511 U.S. at 177 (1994), *see also In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F. Supp. 2d at 591.  "It is generally agreed that *Central Bank* foreclosed a cause of action merely for conspiracy to violate § 10(b) and Rule 10b-5, in addition to aiding and abetting." *In re Enron Corp.*, 235 F.  Supp. 2d at 591; *see also, e.g., Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841 (2d Cir. 1998) *In re Gupta Corp. Sec. Litig.,* 900 F. Supp. 1217, 1243-44 (N.D. Cal. 1994)(dismissing scheme claims as recharacterized conspiracy claims).

As the court held in *In re Gupta Corp.*:

> "Plaintiffs also allege secondary liability against all defendants as conspirators in a common plan and scheme to defraud the investing public (¶ 20). Plaintiffs' conspiracy claims, however, are barred by *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). . . .The Supreme Court's reasoning is equally applicable to conspiracy liability. The text of Section 10(b) does not refer to any form of conspiracy liability. Under *Central Bank,* therefore, plaintiffs may not maintain a private action for conspiracy to violate Section 10(b). . . .  Following *Central Bank,* there is no private action for conspiracy under Section 10(b). Accordingly, plaintiffs allegations of conspiracy against all defendants are dismissed with prejudice.

*In re Gupta Corp. Sec. Litig.*, 900 F. Supp. at 1243.  Accordingly, Plaintiffs' claim for conspiracy fails as a matter of federal law.

> (b)     There is No Claim for Conspiracy Under Wyoming Law.

Plaintiffs allege civil conspiracy under Wyoming law, but the claim fails as it does not exist.  The claim of civil conspiracy is not viable in Wyoming following the enactment of Wyo.

Stat. § 1-1-109, accordingly, the Civil Conspiracy claims in the Gibbs and Fieldgrove cases should be dismissed.

Generally, in jurisdictions that recognize civil conspiracy, the elements of the claim include: 1) an association of two or more persons; 2) an unlawful objective, an agreement regarding the objective and the means of pursuing it; 3) the commission of an unlawful act in furtherance of the agreement; and 4) injury resulting therefrom. *See* 4 CAUSES OF ACTION 2D 517 § 4 (2010). Persons who participate in a civil conspiracy are jointly and severally liable for the injuries resulting from the alleged conspiracy. As the liability is joint and several, it is universally recognized that a member of a conspiracy will be liable even though the person did not directly participate in the acts causing injury, as long as those acts were undertaken in furtherance of the conspiracy. *See, e.g., Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987). Conspirators may be held equally liable regardless of the degree of their active participation in the acts undertaken in furtherance of the conspiracy, *Santa Fe Pacific Realty Corp. v. United States*, 780 F.Supp 687, 693 (E.D. Cal. 1991), or regardless of the degree of direct benefit that they derived from the conspiratorial acts. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Arcturus Builders Inc.*, 552 NYS2d 287, 288-89 (1990). Indeed, with regard to the joint nature of the liability associated with civil conspiracies, it has been suggested that it may be improper to try to apportion liability between members of the conspiracy. *State Farm v. Weber*, 767 S.W.2d 336, 338 (Mo. App. 1989).

Joint and several liability has been specifically abrogated in Wyoming. Since the enactment of Wyoming Statute Section 1-1-109, defendants may only be held legally responsible for their individual percentage of fault. The Wyoming legislature has decided that the jury must determine the percentage of fault attributable to each "actor" which in turn "facilitates the legislature's objective to hold each defendant liable *only for his proportion of fault*." *Pinnacle Bank v. Villa*, 100 P.3d 1287, 1293 (Wyo. 2004)(emphasis added). In considering whether the fault of an immune non-party (the State of Wyoming) should be compared with other parties, the Wyoming Supreme Court stated:

> Furthermore, considering the intent of the comparative fault scheme, it is apparent that the State should be included. As noted, it is clear that each defendant is liable only for the percentage of fault attributed to him. Should an "actor" not be included because it is immune, the defendants and other actors are

> apportioned a share of the "actors" fault.  Indeed, "immunity" does not mean
> that a party is not at fault; it simply means that the party cannot be sued.
> Allocating a portion of an immune parties fall to other "actors" for its the intent
> of the comparative fault scheme.  Additionally, it is well established that, under
> Wyoming's comparative fault scheme, a jury is entitled to apportion the fault of
> all those whose acts proximately caused injury to the claimant, parties and
> nonparties alike.   Indeed, because the Legislature includes both parties and
> nonparties in the definition of "actor," it is clear that some parties may be
> apportion fault but may not actually be liable to the plaintiff.

*Id.*  The Wyoming Supreme Court has specifically recognized that one of the primary purposes of the Wyoming comparative fault statute is the "*elimination of joint and several liability.*"  *Board of County Comm'rs of Teton County v. Bassett*, 8 P.3d 1079, 1084 (Wyo. 2000).

Without question, the well-established policy behind Wyoming's comparative fault scheme is diametrically opposed to the rationale behind joint and several liability.  It necessarily follows, therefore, that the Wyoming legislature intended to nullify common law claims allowing for joint and several liability, including civil conspiracy, with the adoption of comparative fault. Any other conclusion would render the well established intent and unambiguous language of 1-1-109 meaningless.

This argument is not necessarily novel.  Indeed, back in 1993, defendants in this Court made a very similar argument, i.e., that comparative fault pre-empts civil conspiracy.  *See Moore v. Wyoming Medical Center*, 825 F. Supp. 1531, 1549-50 (D. Wyo. 1993).  However, this Court did not answer the question at that time, and there is no other known published opinion specifically addressing the issue of whether civil conspiracy can survive in light of 1-1-109.  The only known opinion addressing the viability of civil conspiracy in Wyoming is *Townsend v. Living Centers Rocky Mountain, Inc.*, 947 P.2d 1297 (Wyo. 1997), where the Wyoming Supreme Court held that a claim of civil conspiracy does not exist in at-will employment cases.  *Id.* at 1299.  As *Townsend* dealt with employment issues, the holding is not necessarily precedential here, but it certainly supports the view.

The question presented with regard to the viability of civil conspiracy can and should be answered.  The Wyoming comparative fault statute is unique, and application of other states analyses of the civil conspiracy issue is not necessarily helpful.  Accordingly, this Court should apply the plain and unambiguous language of 1-1-109 and hold that common law claims that

allow joint and several liability, such as civil conspiracy, are contrary to the statute and have been repealed.

        (c)    <u>Even if Conspiracy Exists Under Wyoming Law, No Claim Is Stated.</u>

Even if a Wyoming claim for civil conspiracy exists, no claim is stated as the allegations do not show that there was an unlawful objective, or that DCS and/or CapWest acted with the requisite intent.  (Compl. ¶¶ 194-97) Accordingly, Plaintiffs' claim for conspiracy fails as a matter of law.

      *3.    No Claim For Negligence Is Stated As There Is No Causation Alleged.*

The Thirteenth Claim (the Ninth Claim in Fieldgrove) is for negligence and is simply a recitation of the elements of a claim of negligence devoid of any facts. These allegations are so vague and ambiguous they fail to satisfy the minimum requirements of Fed. R. Civ. P. 8 (a) as articulated in *Iqbal*.  Assuming the other facts alleged elsewhere in the Complaint are considered, it does not state a claim for relief against the Broker Defendants.

        (a)    <u>No Claim for Negligent Misrepresentation Is Stated.</u>

The elements of negligent misrepresentation under Wyoming law are: (a) false information supplied in the course of one's business for the guidance of others in their business; (b) failure to exercise reasonable care in obtaining or relating the information; and (c) pecuniary loss resulting from justifiable reliance on such information.  *Sundown, Inc.v. Pearson Real Estate*, 8 P.3d 324, 332 (Wyo. 2000)(*citing* Restatement, Second, of Torts Section 552(1)).  The facts alleged in either Complaint against the Broker Defendants do not satisfy any of these requirements.

This claim fails because the Complaint does not contain any facts that allege DCS made any representation or supplied any information to Plaintiffs that led to their purchase.  Instead Striker made the representations in question, as set forth in the PPMs.  Further, none of the Plaintiffs can demonstrate reliance.  Certainly the Talmage Trust did not rely on any statements of DCS, to the extent it is a purchaser at all.  As to the Fieldgroves, the purchase of the Debentures was based on the advice and communications from Lawrence and Pope, not DCS. This is true even though the Fieldgroves executed (but allegedly did not complete or prepare) the Subscription Agreements and related materials that confirmed Plaintiffs only were entitled to

rely on the PPM.  Thus, they were charged with the knowledge of the information in the PPM, but where their Complaint alleges they did not rely on it and instead relied on something else— the information in the PPM cannot be said to have caused their investment decision.  In the Gibbs Complaint it alleges that Lawrence knew the actual facts about Striker so there is no possibility of any misrepresentations being made to him by DCS.

Additionally, to the extent Plaintiffs claim negligent misrepresentation through nondisclosure or omission, this claim similarly fails.  The Wyoming Supreme Court has specifically held that an alleged omission or nondisclosure cannot support a claim of negligent misrepresentation.  *See Richey v. Patrick*, 904 P.2d 798, 802 (Wyo. 1995) (a nondisclosure of information "cannot support a claim for misrepresentation.  Since nothing is alleged to have been "represented," an essential element of the claim is missing)(*citing Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 919 (Colo. App. 1991)).

(b)      No Common Law Negligence Claim Is Stated.

Even if the Thirteenth and/or Ninth Claims are construed to be for common law negligence, they still fails as a matter of law.  The elements of this claim are: the defendant owed the plaintiff a duty of reasonable care, the defendant breached the duty, and the defendant's breach was the proximate cause of injury or loss to the plaintiff. *Long v. Daly*, 156 P.3d 994, 997 (Wyo. 2007) (*citing Anderson v. Two Dot Ranch, Inc.*, 49 P.3d 1011, 1014 (Wyo. 2002)).  Under Rule 8 as construed by *Iqbal*, there must be plausible factual allegations to support the claim and threadbare recitals or conclusory recitations of the elements of a cause of action will not suffice. *Iqbal v. Ashcroft*, 129 S. Ct. at 1949-50.  In addition, the Court need not accept legal conclusions as true.  *Id.*

In both cases Plaintiffs have simply not alleged any facts that would demonstrate a causal link between the allegedly negligent conduct of DCS or Womack and the alleged investment losses of Plaintiffs.  Where Fieldgrove Plaintiffs do not allege they read the PPM or actually relied on it, they cannot show a link sufficient to state a claim for negligence as there is no proximate cause between any actions or inactions of DCS and the claimed loss.  In Gibbs, no Plaintiff (assuming they have standing) even alleged they had the PPM, let alone relied on it in connection with the purchase of the Series B Debentures. (Compl. ¶ 61) Thus, there is no proximate cause and this claim fails as against DCS.

As to the claim against Womack personally, there are no facts alleged in either Complaint to show Womack's personal involvement in the Striker offerings—either the Series B, the Series B-2, or the earlier offerings, therefore the claim that he personally had a duty to the Fieldgroves is not accurate as it based solely on corporate status, which is improper.  In addition, no Plaintiff claimed to have been damaged by a breach of duty by Womack, or showed facts demonstrating proximate cause between such alleged breach and their damage.  Without such duty, or a breach of it proximately causing damage, no claim has been stated against Womack for negligence.

  **E.**  **The Court Should Decline To Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.**

In the unlikely event the Court finds that any of the Wyoming and/or Texas claims survive, it is also appropriate for the Court to dismiss the state law claims by declining to exercise supplemental jurisdiction over them. The basis for jurisdiction in this Court for the state law claims is solely based on supplemental jurisdiction. 28 U.S.C. § 1367 provides that the court "may decline to exercise supplemental jurisdiction over a claim…[if] in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  Where as here, there are no viable federal claims against the Broker Defendants, the Court should to decline to exercise supplemental jurisdiction over the remaining state law claims, if any.

**IV.** **CONCLUSION.**

Based on the foregoing, Defendants Direct Capital Securities, Inc., TIC Capital Markets, Inc., Clay Womack, Pacific Security Income Partners LP and Pacific Security Group, Inc. respectfully request that the Court grant their motion to dismiss the claims alleged against them.

DATED this 18th day of September, 2010.

    Rick L. Koehmstedt
    **SCHWARTZ, BON, WALKER & STUDER, LLC**

        /s/
    Rick L. Koehmstedt

    Thomas N. FitzGibbon
    **PFEIFFER THIGPEN FITZGIBBON & ZIONTZ LLP**

    Thomas N. FitzGibbon

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document entitled **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM FOR RELIEF PURSUANT TO FED. R. CIV. P. 12(b)(6) OF DEFENDANTS DIRECT CAPITAL SECURITIES, INC., TIC CAPITAL MARKETS, INC., CLAY WOMACK, PACIFIC SECURITY INCOME PARTNERS LP AND PACIFIC SECURITY GROUP, INC.** has been e-filed and thereby served electronically via the Court's CM/ECF system in accordance with Federal Rule of Civil Procedure 5(b) on September 18, 2010.

_____
                    Thomas N. FitzGibbon